# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

————

No. 03-3136

————

| | | |
|---|---|---|
| Iowa, Chicago & Eastern Railroad Corporation, | * * * | |
| Plaintiff - Appellant, | * | Appeal from the United States |
| | * | District Court for the |
| v. | * | Southern District of Iowa. |
| | * | |
| Washington County, Iowa, et al., | * * | |
| Defendants - Appellees | * | |

————

Submitted: April 15, 2004
Filed: August 25, 2004

————

Before LOKEN, Chief Judge, BYE, Circuit Judge, and MAGNUSON,* District Judge.

————

LOKEN, Chief Judge.

The interstate rail line of the Iowa, Chicago & Eastern Railroad Corporation (IC&E) includes four bridges in Washington County, Iowa. The County wants all four bridges replaced because their antiquated design results in "substandard highway safety conditions at all four sites." Two bridges carry the rail line over County highways. According to the County, they have "severely deficient vertical clearances for highway traffic," and one is too narrow. The other two carry highways over the

_____

*The HONORABLE PAUL A. MAGNUSON, United States District Judge for the District of Minnesota, sitting by designation.

rail line.  One was destroyed by fire and has not been replaced.  The other has a sharp crest, creating the risk that trucks, farm equipment, school busses, and emergency vehicles will "bottom out" on the crossing.  IC&E maintains that the three remaining bridges and the fourth crossing are sufficient for railroad purposes.  It is unwilling to finance road improvements that benefit trucking competitors but not the railroad.

The County and IC&E first negotiated replacing the bridges.  IC&E agreed to cooperate but refused to provide funding.  In January 2002, the County petitioned the Iowa Department of Transportation ("IDOT") for a ruling that IC&E must pay for replacement bridges to comply with Iowa Code § 327F.2.[1]  IDOT referred the petition to the Department of Inspections and Appeals for a hearing to determine, among other issues, "the portion of the expense to be paid by each party to the controversy."  Iowa Code § 327G.17.  Before that hearing was completed, the parties obtained a stay, and IC&E commenced this action against the County and the Director of IDOT, seeking a declaratory judgment that § 327F.2 is preempted by the Interstate Commerce Commission Termination Act of 1995 ("ICCTA").  Pub. L. 104-88, 109 Stat. 803. After the parties submitted a stipulated record, the district court[2] held that § 327F.2 is not preempted.  IC&E appeals.  We affirm.

**I.**

Congress established the Interstate Commerce Commission in 1890, giving it broad authority to regulate many facets of the railroad industry, a major component

---

[1]Iowa Code § 327F.2 provides: "Every railroad company shall build, maintain, and keep in good repair all bridges, abutments, or other construction necessary to enable it to cross over or under any . . . public highway, or other way . . . ."

[2]The HONORABLE CHARLES R. WOLLE, United States District Judge for the Southern District of Iowa.

of the nation's interstate transportation network. Ninety years later, to reverse the industry's severe decline, Congress in the Staggers Act of 1980 significantly reduced the ICC's regulatory authority. In 1995, convinced that even greater deregulation was needed, Congress enacted ICCTA, terminating the ICC altogether. ICCTA transferred essential ICC regulatory functions to the Surface Transportation Board (STB), a quasi-independent three-member body within the Department of Transportation. See 49 U.S.C. §§ 701-703. ICCTA repealed much of the economic regulation previously conducted by the ICC and by state railroad regulators working in conjunction with the ICC. In so doing, Congress recognized that continuing state regulation -- of intrastate rail rates, for example -- would "risk the balkanization and subversion of the Federal scheme of minimal regulation for this intrinsically interstate form of transportation." H.R. REP. NO. 104-311, at 96, reprinted in 1995 U.S.C.C.A.N. 793, 808. Accordingly, Congress included in ICCTA a broadly worded preemption provision, codified at 49 U.S.C. § 10501(b):

> (b) The jurisdiction of the [STB] over --
>
> (1) transportation by rail carriers, and the remedies provided in this part with respect to rates, classifications, rules (including car service, interchange, and other operating rules), practices, routes, services, and facilities of such carriers; and
>
> (2) the construction, acquisition, operation, abandonment, or discontinuance of spur, industrial, team, switching, or side tracks, or facilities, even if the tracks are located, or intended to be located, entirely in one State,
>
> is exclusive. Except as otherwise provided in this part, the remedies provided under this part with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law.

IC&E argues that this statute preempts Iowa Code § 327F.2 as applied in this case because (i) ordering IC&E to pay the cost of replacing four bridges is expressly preempted economic regulation; (ii) ordering the replacement of bridges carrying the rail line over highways is expressly preempted regulation of facilities essential to IC&E's rail service; and (iii) Congress in ICCTA occupied the field of economic and facilities regulation of railroads.[3]  The argument is simple, but it is deceptively simple, for it ignores relevant federal statutes that were enacted before ICCTA, that are administered by one or more agencies other than the ICC or the STB, and that Congress left intact in enacting ICCTA.

## II.

**The Federal Rail Safety Act.**  The Federal Rail Safety Act of 1970, Pub. L. 91-458, 84 Stat. 971 (the "FRSA"), gives the Secretary of Transportation broad powers "to promote safety in all areas of railroad operations."  49 U.S.C. § 20101. The FRSA specifically addresses "the railroad grade crossing problem."  49 U.S.C. § 20134(a).  It also includes a limited preemption provision.[4]  In a pre-ICCTA case, the Supreme Court held that the FRSA preempts state tort law regulation of railroad grade crossing safety *only* when federal funds participate in the installation of warning devices and the devices are subject to the approval of the Federal Highway Administration (the "FHWA").  CSX Transp., Inc. v. Easterwood, 507 U.S. 658, 665-71 (1993).  Since the enactment of ICCTA, the Supreme Court has expressly

---

[3]The Canadian National Railway Company and the Union Pacific Railroad Company have submitted amicus briefs supporting IC&E's preemption argument.

[4]"Laws . . . related to railroad safety . . . shall be nationally uniform to the extent practicable.  A State may adopt or continue in force a law . . . related to railroad safety . . . until the Secretary of Transportation prescribes a regulation or issues an order covering the subject matter of the state requirement."  49 U.S.C. § 20106.

reaffirmed this preemption ruling. See Norfolk S. Ry. v. Shanklin, 529 U.S. 344, 352-57 (2000).

The Sixth Circuit recently considered the interplay between ICCTA and FRSA preemption in Tyrrell v. Norfolk S. Ry., 248 F.3d 517, 522 (6th Cir. 2001), an FELA case. The railroad argued that ICCTA preempted a state regulation prescribing the clearance between the tracks in a rail switching yard. Adopting the position urged by the United States and the STB as amici, the court held that ICCTA and the FRSA must be construed *in pari materia*; that the Federal Railroad Administration under the FRSA exercises primary authority over rail safety; and therefore that the FRSA, not ICCTA, determines whether a state law relating to rail safety is preempted.

In this case, neither the appellate briefs nor the district court's opinion discussed the FRSA. When we raised the issue before oral argument, IC&E argued that the limited FRSA preemption provision does not apply because the County seeks to replace the bridges for reasons of "highway improvement," not rail safety. This argument is unpersuasive. The reasons for replacing the bridges as stated in the stipulated record clearly include a safety component. For example, the risk that school buses and emergency vehicles will bottom out on a highway bridge is a safety issue, albeit a highway safety issue. If IC&E is arguing that "rail safety" for purposes of FRSA preemption does not include the highway safety risks created at rail crossings, that cramped reading of the FRSA is inconsistent with 49 U.S.C. § 20134(a), with the federal rail crossing regulations discussed in Easterwood, and with common sense. More importantly, the argument ignores other federal statutes that specifically address the problem of deteriorating or inadequate railway-highway bridges.

**The Federal Regulation of Highway Bridges.** In 1944, Congress first provided federal funds "for the elimination of hazards of railway-highway crossings, including the separation or protection of grades at crossings." 23 U.S.C. § 130(a).

The statute as amended provides that any railroad participating in a federally funded project "shall be liable to the United States for the net benefit to the railroad," as determined by the Secretary. 23 U.S.C. § 130(c). The FHWA regulations discussed in Easterwood apply to this statute, as well as to the FSRA. See 23 C.F.R. § 646.200(b). The regulations expressly preempt state cost-sharing laws when projects are federally funded. 23 C.F.R. § 646.210(a). They expressly provide that projects to reconstruct existing grade separations (such as bridges) "are deemed to generally be of no ascertainable net benefit to the railroad and there shall be no required railroad share of the costs" absent a contractual obligation, 23 C.F.R. § 646.210(b)(2).

However, § 130 and its implementing regulations also contemplate substantial state regulatory involvement. For example, each State must survey all highways, identify railroad crossings that may require separation, "and establish and implement a schedule of projects for this purpose." 23 U.S.C. § 130(d). When a project is federally funded, the design of facilities that are the railroad's responsibility "shall conform to the . . . standards used by the railroad in its normal practice, subject to approval *by the State highway agency* and FHWA." 23 C.F.R. § 646.214(a) (emphasis added). Thus, while § 130 did not expressly address the question of federal preemption, as the FRSA did, we see a strong basis to infer that the preemptive effect of § 130 is similarly limited to the federally regulated or prescribed aspects of federally funded railway-highway bridge replacement projects. Accord CSX Transp., Inc. v. Mayor & City Council of Baltimore, 759 F. Supp. 281 (D. Md. 1991), aff'd per curiam, 979 F.2d 356 (4th Cir. 1992).

In 1970, Congress again addressed the problem of deteriorating highway bridges by creating a Highway Bridge Replacement and Rehabilitation Program "to enable the several States to replace or rehabilitate highway bridges over waterways, other topographical barriers, other highways, *or railroads*." 23 U.S.C. § 144(a) (emphasis added). This statute as amended directs the Secretary of Transportation

and the States to inventory and classify highway bridges to establish a priority for replacement or rehabilitation.  § 144(b) & (c).  The States may then apply for federal funds to assist in replacing or rehabilitating eligible bridges.  § 144(d).  In 1991, to provide the States "additional flexibility," the statute was amended to provide federal funding for "off-system" bridges, defined in 23 U.S.C. § 101(a)(5) as those located on local roads that are not Federal-aid highways.  S. REP. NO. 100-4, reprinted in 1987-2 U.S.C.C.A.N. 66, 73; see 23 U.S.C. §§ 144(g)(3) & (n).  At the same time, Congress added a specific *non-preemption* provision, 23 U.S.C. § 144(p):

> A [federally funded] project not on a Federal-aid highway under this section shall be designed, constructed, operated, and maintained in accordance with State laws, regulations, directives, safety standards, design standards, and construction standards.

We have found no case or legislative history discussing whether ICCTA had any impact on the prior preemptive effect of 23 U.S.C. § 130 or 23 U.S.C. § 144.

## III.

Part II of this opinion has reviewed a complex array of statutes and regulations. We would not presume to construe them definitively in the abstract.  But our brief review does establish that Congress for many decades has forged a federal-state regulatory partnership to deal with problems of rail and highway safety and highway improvement in general, and the repair and replacement of deteriorated or obsolete railway-highway bridges in particular.  ICCTA did not address these problems.  Its silence cannot reflect the requisite "clear and manifest purpose of Congress" to preempt traditional state regulation of public roads and bridges that Congress has encouraged in numerous other statutes.  Easterwood, 507 U.S. at 664 (quotation omitted).  Indeed, IC&E's broad argument that ICCTA preempted *this type* of state regulation of railroad "facilities" would require us to conclude that Congress

impliedly repealed, at a minimum, 23 U.S.C. § 144(p) and 23 C.F.R. § 646.214(a). Implied repeals are not favored.  See J.E.M. Ag Supply, Inc. v. Pioneer Hi-Bred Int'l, Inc., 534 U.S. 124, 141-42 (2001).

We therefore conclude that, on this record, IC&E has failed to establish that ICCTA's preemption provision preempts the state administrative proceedings commenced by IDOT in response to the County's petition that IC&E be ordered to replace the four bridges at its own expense pursuant to Iowa Code § 327F.2.  Our holding is necessarily narrow because the state proceedings are incomplete and the States do not operate in this arena free of federal involvement.  For example, should the parties obtain federal funding for one or more of these bridge projects,[5] federal law would apportion the project costs.  State laws requiring IC&E to pay or share those costs, including § 327F.2, would then be expressly preempted.  See 23 C.F.R. § 646.210(a); Shanklin, 529 U.S. at 352.  Moreover, even if federal funds do not participate, IDOT's application of § 327F.2 to a particular bridge project must be consistent with the long-standing constitutional principle that State and local governments may require railroads to pay for the cost of railway-highway bridges "made necessary by the rapid growth of the communities," but "such allocation of costs must be fair and reasonable."  Atchison, Topeka & Santa Fe Ry. v. Pub. Util. Comm'n, 346 U.S. 346, 352 (1953); see Nashville, Chattanooga & St. Louis Ry. v. Walters, 294 U.S. 405, 428-32 (1935); Erie R.R. v. Bd. of Pub. Util. Comm'rs., 254 U.S. 394, 410 (1921).  These more narrow issues of federal law may not be addressed until IC&E's share of any bridge replacement costs has been determined.

At our request, the United States for the Department of Transportation and the STB submitted separate amicus briefs addressing many of these issues.  Both

---

[5]We are told that two of the bridges appear on FHWA's National Bridge Inventory, which presumably makes them eligible for federal funding under 23 U.S.C. § 144(d).  The others may be eligible for funding as "off-system bridges" under § 144(g)(3) and (n).  See generally 23 C.F.R. §§ 650.401-.413.

agencies agree with our conclusion that IC&E's broad ICCTA preemption argument is unsound and that more narrow federal preemption or supremacy issues are premature. Both agencies urge us to vacate the district court's decision as premature to allow IDOT to complete its state administrative proceedings. We conclude this is unnecessary because the district court's decree is consistent with our narrow holding. Accordingly, the August 7, 2003, judgment of the district court is affirmed. IC&E's motion to file a supplemental reply brief is granted.

_____