NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 05a0103n.06
Filed: February 10, 2005

No. 03-4180

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

CUYAHOGA FALLS & HUDSON )
RAILWAY COMPANY, )
 )
 Plaintiff-Appellant, )
 )
v. ) ON APPEAL FROM THE UNITED
 ) STATES DISTRICT COURT FOR THE
THE VILLAGE OF SILVER LAKE, ) NORTHERN DISTRICT OF OHIO
 )
 Defendant-Appellee. )

Before: GILMAN and SUTTON, Circuit Judges; McKEAGUE, District Judge.[*]

SUTTON, Circuit Judge. Cuyahoga Falls & Hudson Railway Company (Cuyahoga Falls) challenges the district court's denial of a declaratory-judgment request seeking to preempt the Village of Silver Lake's application of a local zoning ordinance to its railroad operation under the Interstate Commerce Commission Termination Act of 1995 (ICCTA), 49 U.S.C. § 10501, and the federal Commerce Clause. Because Cuyahoga Falls plans to operate a purely intrastate passenger excursion train that does not appear to have any conceivable impact on "transportation . . . as part of the interstate rail network," *id.*, and because no other trains with any connection to interstate commerce operate along the same stretch of railroad track, we affirm.

---

[*]The Honorable David W. McKeague, United States District Judge for the Western District of Michigan, sitting by designation.

I.

The Akron Secondary is a 6.5-mile stretch of railroad line that extends from an interchange with a railroad operated by CSX Transportation in Cuyahoga Falls, Ohio, to an interchange with Norfolk Southern's mainline in Hudson, Ohio. Like many other stretches of railroad line that once provided the major means of transportation for the nation, the Akron Secondary is in a state of disuse. Neither of its interchanges, for example, is in current service and no freight is currently transported over it.

The current owner of the Akron Secondary is the METRO Regional Transit Authority. On December 30, 2002, METRO and Cuyahoga Falls signed a lease agreement that gave Cuyahoga Falls the limited right to operate a rail passenger excursion and dinner service over the Akron Secondary. Cuyahoga Falls' rail passenger excursion, the record reveals, "proposed to have musical reviews, stand-up comedy, or murder/mystery/romance productions, with food and beverage service." JA 160. Passengers would board the excursion train in Cuyahoga Falls, have dinner as the train traveled to Hudson and back, then disembark.

The lease agreement barred Cuyahoga Falls from engaging in any freight services on the line, and in fact another railroad, Norfolk Southern, retains the right to restart freight operations over the Akron Secondary. Under the lease agreement, the railroad excursion would begin and end within Ohio and would service passengers with purely intrastate ticketing and with no connection to interstate rail passenger service.

Part of the Akron Secondary runs through the Village of Silver Lake, Ohio. On August 2, 2002, Silver Lake filed a lawsuit in the Court of Common Pleas for Summit County, Ohio, to enjoin METRO and the Adrian & Blissfield Railroad Company (which both parties characterize as a "brother-sister" affiliate or "alter ego" of Cuyahoga Falls, *see* JA 14, 168) from violating its zoning ordinance. The defendants in the state court proceeding then filed a motion to dismiss, "raising essentially the same federal preemption arguments" at stake in this case, which the state court rejected. JA 169. On January 23, 2003, the state court parties entered into a "standstill agreement" under which they agreed to "maintain the status quo on the Property, as to the operation of a dinner excursion train" until February 25, 2003. JA 175.

What appeared until that point to be a dispute between a local entertainment service and a small town became a federal lawsuit on February 21, 2003, when Cuyahoga Falls, invoking the ICCTA and the Commerce Clause, brought a declaratory judgment action in federal court to halt Silver Lake's attempt to enforce its zoning code against the railroad in state court. As stated in its initial complaint, Cuyahoga Falls sought (1) "declaratory relief . . . that SILVER LAKE's attempts at regulating and restricting [its] business activities, by means of the VILLAGE's Zoning Code, is preempted by federal law and the United States Constitution" and (2) "injunctive relief in preventing Defendants, and those acting in concert with them, from taking, and/or continuing to take, actions to regulate and restrict the business activities" of the railroad. JA 14. The complaint highlighted that Cuyahoga Falls had filed its federal suit in response to Silver Lake's "commence[ment of] an action against . . . [it] in the Court of Common Pleas for Summit County, Ohio." JA 17. A few

weeks later, on March 12, 2003, Cuyahoga Falls withdrew its motion for a preliminary injunction and refiled its complaint seeking only declaratory relief and, notably, omitting the complaint's sole reference to the pending state court action.

On June 9, 2003, the parties entered into a joint statement of facts that, among other things, stipulated that Cuyahoga Falls intended to operate a passenger excursion train over the 6.5 miles of the Akron Secondary without any through ticketing and that Cuyahoga Falls had "no firm arrangements to institute and provide freight service over the 'Akron Secondary' . . . or to operate the 'Akron Secondary' line for any purpose other than passenger excursion trips." JA 362. Following this filing, Cuyahoga Falls claimed that its President, Gabriel Hall, received two offers from unidentified customers seeking to use the Akron Secondary to provide interstate freight service.

The district court granted Silver Lake's motion for summary judgment on August 6, 2003. Cuyahoga Falls, the court observed, "will not connect its rail passenger service with any other common carrier railroads . . . . [A]n excursion on the Dinner Train will not be part of any larger, interstate rail journey." D. Ct. Op. at 7. "Since the Akron Secondary will not be part of the interstate rail network," the court concluded, "Silver Lake's zoning code is not preempted by 49 U.S.C. § 10501." *Id.*

II.

The principal statute over which the parties disagree is 49 U.S.C. § 10501, which gives the Surface Transportation Board exclusive jurisdiction over railroad "*transportation by rail carrier . . . in the United States between a place in . . . a State and a place in the same or another State as part of the interstate rail network.*" 49 U.S.C. § 10501(a)(2)(A) (emphasis added). Federal regulation of railroads, while "pervasive and comprehensive," *Chicago & N.W. Transp. Co. v. Kalo Brick & Tile Co.*, 450 U.S. 311, 318 (1981), is not limitless, but rather extends only to "rail carriers" who engage in transportation over the "interstate rail network." It is not clear, for example, that Cuyahoga Falls qualifies as a "rail carrier" given the Act's extensive registration requirements necessary to achieve that status. *See, e.g.*, 49 U.S.C. § 10502(a) (permitting the Surface Transportation Board to exempt rail carriers whenever application of federal law "is not necessary to carry out [federal] transportation policy" because "the transaction or service is of limited scope").

Nor has Cuyahoga Falls shown that its proposed intrastate dinner excursion train on the 6.5-mile Akron Secondary concerns the interstate rail network. Section 10501 grants exclusive jurisdiction to the federal government for "transportation . . . as a part of the interstate rail network." Nothing within the statute suggests that purely intrastate transportation that has no bearing on interstate transportation falls within the federal government's exclusive jurisdiction. *See Fun Trains, Inc.*, STB Finance Docket No. 33472 (1998) (declining to exercise jurisdiction over an intrastate excursion train); *Napa Valley Wine Train, Inc.*, 7 I.C.C. 2d 954 (1991) (same); *cf. Magner-O'Hara Scenic Railway v. ICC*, 692 F.2d 441 (6th Cir. 1982) (pre-ICCTA case holding the same). Cuyahoga

Falls did not bring to the district court's attention any other trains that plan to use the Akron Secondary as part of the interstate rail network, except through an eleventh-hour affidavit that contradicted facts to which it had previously stipulated. Bolstering our reading of the statute is the familiar presumption that Congress does not lightly trench upon a state's authority to regulate purely intrastate matters. *See, e.g.*, *Iowa, Chi. & Eastern R.R. Corp. v. Wash. County*, 384 F.3d 557, 561 (8th Cir. 2004) (noting that the ICCTA's "silence cannot reflect the requisite 'clear and manifest purpose of Congress' to preempt traditional state regulation of public roads and bridges that Congress has encouraged in numerous other statutes"); *see also Solid Waste Agency v. United States Army Corps of Eng'rs*, 531 U.S. 159, 172–73 (2001); *Jones v. United States*, 529 U.S. 848, 850 (2000).

Nor do we believe that the dormant Commerce Clause preempts Silver Lake's regulation of its own internal affairs through its zoning code. Cuyahoga Falls has not shown that Silver Lake's zoning code has the purpose or effect of discriminating against out-of-state parties and has cited no facially discriminatory provisions of the zoning ordinance. *See, e.g.*, *Camps Newfound/Owatonna, Inc. v. Town of Harrison*, 520 U.S. 564 (1997); *Hunt v. Wash. State Apple Advertising Comm'n*, 432 U.S. 333 (1977).

## III.

For these reasons, we affirm.