07-3125-cv
**Island Park, LLC  v.  CSX Transportation, Inc.**

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

—————

August Term, 2008

(Argued: October 16, 2008                              Decided: March 4, 2009
Amended: March 4, 2009)

Docket No. 07-3125-cv(L), 07-3281-cv(XAP), 07-3283-cv(CON), 07-3288-cv(CON)

—————

ISLAND PARK, LLC,

*Plaintiff-Appellee-Cross-Appellant,*

—v.—

CSX TRANSPORTATION AND CONSOLIDATED RAIL CORPORATION, NATIONAL RAILROAD PASSENGER SERVICE ("AMTRAK"), THOMAS J. MADISON JR., IN HIS CAPACITY AS COMMISSIONER OF THE STATE OF NEW YORK DEPARTMENT OF TRANSPORTATION ("NYSDOT") AND DENNISON P. COTTRELL, IN HIS CAPACITY AS DIRECTOR OF THE PASSENGER AND FREIGHT SAFETY DIVISION OF NYSDOT,

*Defendants-Appellants-Cross-Appellees.*

—————

Before:

JACOBS, *Chief Judge*, WESLEY, *Circuit Judge*, and ARCARA, *District Judge*.[1]

Appeal from a judgment of the United States District Court for the Northern District of New York (Kahn, *J.*), entered on June 26, 2007, *inter alia*, granting plaintiff Island Park, LLC summary judgment *sua sponte* on its claim that the New York State Department of

---

[1] The Honorable Richard J. Arcara, Chief Judge, United States District Court for the Western District of New York, sitting by designation.

Transportation's closure of a private rail crossing pursuant to N.Y. Railroad Law § 97(3) was pre-empted by the Interstate Commerce Commission Termination Act ("ICCTA"). New York State's closure of this private rail crossing does not burden railroad operations and therefore does not fall within the definition of "transportation" on the ground that it is "property . . . related to the movement of passengers or property . . .by rail." 49 U.S.C. § 10102(9)(A). The exercise of state authority to close the rail crossing at issue pursuant to N.Y. Railroad Law § 97(3) is not pre-empted under ICCTA or the Federal Railroad Safety Act ("FRSA"). The judgment of the district court is REVERSED and the case is REMANDED to the district court (1) so that it may enter summary judgment in favor of defendants CSX Transportation Inc., Consolidated Rail Corporation and Amtrak, and defendants Madison and Cottrell on Island Park's pre-emption claim, and (2) for further proceedings on Island Park's fourth claim.

---

CARTER PHILLIPS (G. Paul Moates, Paul A. Hemmersbaugh and Matthew J. Warren, *on the brief*), Sidley Austin LLP, Washington, DC, and Susan C. Roney and Benjamin Dwyer, Nixon Peabody, LLP, Buffalo, NY *for Appellants CSX Transportation Inc. & Consolidated Rail Corporation.*

FRANK BRADY, Assistant Solicitor General, *for* Andrew M. Cuomo, Attorney General of the State of New York, *for Appellants Madison and Cottrell.*

J. MICHAEL NAUGHTON, Young Sommer, LLC, Albany, NY, *for Appellees.*

---

WESLEY, *Circuit Judge*:

Many appeals require this Court to chart the point at which state authority yields to federal power. In this case, that intersection is not merely theoretical. The question presented here is whether New York's attempt to close a railroad crossing over a private road is pre-empted by the federal statutory scheme governing our nation's railroads. We hold that it is not. Accordingly, we reverse the judgment of the United States District Court for the Northern District of New York (Kahn, *J.*).

# FACTS

Plaintiff Island Park, LLC ("Island Park") owns and operates a 400 acre nursery outside Albany, New York.[2] Railroad tracks owned by Defendant CSX Transportation, Inc. ("CSXT") intersect Island Park's property. The tracks are part of the "Hudson Line," a heavily traveled, primarily passenger-based railroad line that runs between Albany and New York City.[3] The Hudson Line consists of two sets of parallel railroad tracks that are raised and bordered by steep embankments on both sides. Island Park possesses an easement to use a private rail crossing, referred to by the parties and the district court as "Abele's Crossing," and accessed through private unpaved roads. No automated warning system is connected to the crossing. Island Park stores tractors and cultivation equipment on one side of the tracks and uses the rail crossing to reach the fields on the other.

By way of background, in August 1981, the prior owners of the Island Park property, John Abele, Harry Abele and Francis Schmidt (hence the name "Abele's Crossing") brought an action in New York State Supreme Court, Rensselaer County, seeking an order enjoining Conrail from interfering with their use of the crossing. The parties reached a settlement in 1988 that required Conrail to restore the crossing, to pay the Abeles a sum of money, and to "cease and desist from interfering with said crossing of the plaintiffs and their predecessors and successors in interest from now until all time." In June 1989, the state court reduced the stipulation to an

---

[2] The following undisputed facts derive from the parties' statements of material facts.

[3] Defendant Consolidated Rail Corporation ("Conrail") owned the Hudson Line prior to CSXT's acquisition of Conrail's interest. Defendant National Railroad Passenger Service Corporation ("Amtrak") maintains portions of the Hudson Line. CSXT, Conrail and Amtrak will collectively be referred to as the "Railroad Defendants."

order and directed Conrail to "restore the railroad crossing and maintain said crossing in the present and in the future at defendant's sole expense." Pursuant to that order, Conrail and/or Amtrak made improvements to the crossing, such as installing gates and warning signs, and paving the surface of the crossing. According to Island Park, the crossing has been used as a private farm crossing on a continuous basis from 1989 until the present.

In February 2005, NYSDOT commenced an administrative proceeding pursuant to N.Y. Railroad Law § 97(3) to determine if the crossing "should be altered or closed and discontinued." Following a public hearing, an Administrative Law Judge ("ALJ") recommended that the crossing be closed and discontinued for safety reasons. The ALJ noted that Island Park uses the crossing to transport heavy, slow-moving farm equipment and that high-speed passenger trains frequently pass through the crossing. The tracks are "super elevat[ed]" to accommodate the high-speed trains on the Hudson Line, thereby creating a "hump" for vehicles crossing the tracks. The ALJ found that the substantial grade of the approaches to the crossing, the "hump" in the crossing, and the limited sight distance due to track curvature presented very serious safety concerns because these conditions "adversely affect[ed] the time it takes to cross." In addition, although the ALJ recognized that the evidence clearly established that "the crossing serves as a convenient access point," it also noted that "reasonable alternatives," i.e., safer points of access to Island Park's property, existed. Thereafter, in March 2006, Defendant Dennison P. Cottrell, NYSDOT's Director of the Passenger and Freight Safety Division, signed a closure order and directed CSXT to remove the crossing surface and install barricades preventing the use of the crossing.

Shortly after receipt of the closure order, Island Park commenced this action in federal

district court seeking a permanent injunction enjoining the Railroad Defendants from enforcing or executing NYSDOT's order.[4] The complaint asserted the following claims: (1) the closure order was pre-empted by the Interstate Commerce Commission Termination Act ("ICCTA") and the Federal Railroad Safety Act ("FRSA"); (2) the State Defendants deprived Island Park of its property interest without due process of law in violation of 42 U.S.C. § 1983; (3) the State Defendants' actions constituted a taking of its property interest without just compensation or due process in violation of 42 U.S.C. § 1983; and (4) pursuant to the 1989 state court judgment, the Railroad Defendants were obligated to keep the crossing open. The district court issued a temporary restraining order and all Defendants subsequently moved for summary judgment to dismiss the complaint. Island Park cross-moved for summary judgment on its second and third causes of action.

The district court denied Island Park's motion for summary judgment, but *sua sponte* granted it summary judgment on its pre-emption claim. *See Island Park, LLC v. CSX Transp., Inc.*, No. 1:06-CV-310, 2007 WL 1851784 (N.D.N.Y. June 26, 2007). The court permanently enjoined (1) the State Defendants from employing N.Y. Railroad Law § 97(3) to order the closure of the crossing, and (2) the Railroad Defendants "from undertaking any actions to barricade [the crossing] pursuant to the order issued by State Defendants . . ." *Id.* at *15. As a result of granting summary judgment to Island Park on its pre-emption claim, the court dismissed

---

[4] The complaint also named the following "State Defendants": Thomas J. Madison Jr., in his capacity as Commissioner of NYSDOT and Dennison P. Cottrell, in his capacity as Director of the Passenger and Freight Safety Division of NYSDOT.

its fourth claim seeking to enforce the 1989 state court judgment as moot. *Id.* at *14.[5]

On appeal, both the Railroad and State Defendants argue that the district court erroneously determined that the closure order was pre-empted by federal law. The Railroad Defendants also challenge the propriety of the district court's *sua sponte* grant of summary judgment to Island Park without prior notice, which they argue denied them the opportunity to present evidence and legal argument in opposition to summary judgment. Island Park, in addition to defending the district court's determination, advances two alternate grounds on which this Court should affirm the district court judgment – i.e., that it was deprived of its property interest in the crossing without due process of law, and that the closure order constituted a taking of property without just compensation.[6] Because we agree with the Defendants that neither ICCTA nor FRSA pre-empts the state closure order, the district court judgment granting Island Park summary judgment on its pre-emption claim must be reversed. We further conclude that the district court correctly rejected Island Park's due process and takings claims; thus, we decline to affirm the district court judgment on those alternative grounds. Lastly, we remand to the district court for further proceedings on Island Park's fourth claim (which sought enforcement of

---

[5] The court also partially granted the summary judgment motions of the Railroad Defendants and the State Defendants dismissing Island Park's second and third claims (due process and takings). 2007 WL 1851784, at *4-*9.

[6] Although Island Park cross-appealed, its appeal must be dismissed because it does not seek to modify the district court judgment. The judgment granted Island Park a permanent injunction, which was all the relief it requested. "[N]o cross-appeal was necessary to bring these contentions before us if they can be considered otherwise. They would simply be alternative grounds on which the judgment below could be supported." *Doro v. Sheet Metal Workers' Int'l Ass'n*, 498 F.3d 152, 156 n.4 (2d Cir. 2007) (quoting *United States v. Raines*, 362 U.S. 17, 27 n.7 (1960)). We therefore consider the arguments Island Park makes in support of its cross-appeal as arguments for affirming the district court judgment.

the 1989 state court judgment) because that claim is no longer moot in light of our reversal of the district court's judgment.

## DISCUSSION

A party is entitled to summary judgment only if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "[A] determination regarding preemption is a conclusion of law, and we therefore review it *de novo*." *Drake v. Lab. Corp. of Am. Holdings*, 458 F.3d 48, 56 (2d Cir. 2006).[7] Although "[d]istrict courts have the discretion to grant summary judgment sua sponte, even without notice in certain circumstances," we have cautioned that "care should be taken by the district court to determine that the party against whom summary judgment is rendered has had a full and fair opportunity to meet the proposition that there is no genuine issue of material fact to be tried, and that the party for whom summary judgment is rendered is entitled thereto as a matter of law." *Schwan-Stabilo Cosmetics GmbH & Co. v. PacificLink Int'l Corp.*, 401 F.3d 28, 33 (2d Cir. 2005) (citation, internal quotation marks and alterations omitted). In this case, while the district court may have been ill-advised in granting summary judgment *sua sponte* to Island Park on this difficult pre-emption question, it did not err in concluding that this case was suitable for resolution by summary judgment. The material facts are undisputed and the pre-emption issue is a question of law that has been fully briefed by the parties. Accordingly, a remand to the district court for a trial on this issue is not required. For the reasons that follow, we reverse and direct

---

[7] It is well established that we review a district court's grant of summary judgment *de novo*. *See A & J Produce Corp. v. Bronx Overall Econ. Dev. Corp.*, 542 F.3d 54, 57 (2d Cir. 2008).

entry of summary judgment for Defendants dismissing Island Park's pre-emption claim.

**I.      Pre-emption**

The Supremacy Clause, Article VI, cl. 2 of the United States Constitution, provides that the laws of the United States "shall be the supreme Law of the Land; . . . any Thing in the Constitution or Laws of any state to the Contrary notwithstanding." Thus, "state laws that 'interfere with, or are contrary to,' federal law" must be invalidated. *Hillsborough County, Fla. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 712 (1985) (quoting *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 211 (1824)). The Supreme Court has long recognized that "'[t]he purpose of Congress is the ultimate touchstone' in every pre-emption case." *Altria Group, Inc. v. Good*, 129 S. Ct. 538, 543 (2008) (alteration in original) (quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996)). Congressional intent "primarily is discerned from the language of the pre-emption statute and the statutory framework surrounding it." *Green Mountain R.R. Corp. v. Vermont*, 404 F.3d 638, 641 (2d Cir. 2005) (quoting *Medtronic*, 518 U.S. at 485-86).

Pre-emption may be express or implied. "Express preemption arises when 'a federal statute expressly directs that state law be ousted.'" *Air Transp. Ass'n of Am. v. Cuomo*, 520 F.3d 218, 220 (2d Cir. 2008) (per curiam) (quoting *Ass'n of Int'l Auto. Mfrs. v. Abrams*, 84 F.3d 602, 607 (2d Cir. 1996)). In the absence of an express directive from Congress, pre-emption may "be inferred if the scope of the statute indicates that Congress intended federal law to occupy the legislative field, or if there is an actual conflict between state and federal law." *Altria Group*, 129 S. Ct. at 543 (citing *Freightliner Corp. v. Myrick*, 514 U.S. 280, 287 (1995)); *see also English v. Gen. Elec. Co.*, 496 U.S. 72, 79 (1990). Implied pre-emption exists when "the pervasiveness of the federal regulation precludes supplementation by the States, where the

federal interest in the field is sufficiently dominant, or where the object sought to be obtained by the federal law and the character of obligations imposed by it reveal the same purpose." *Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 300 (1988) (citation, internal quotation marks and alterations omitted). The Supreme Court has cautioned, however, that the presence of an express pre-emption clause in a federal statute "does not immediately end the inquiry because the question of the substance and scope of Congress' displacement of state law still remains." *Altria Group*, 129 S. Ct. at 543. Indeed, when courts are called upon to address questions of express or implied pre-emption, the analysis always begins "'with the assumption that the historic police powers of the States [are] not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.'" *Id.* (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)); *see CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 663-64 (1993).

Two federal statutes – ICCTA and FRSA – potentially pre-empt NYSDOT's rail crossing closure order. Island Park's complaint alleges that the closure order was pre-empted by both. The district court concluded that the order was pre-empted by ICCTA and did not reach the issue of pre-emption under FRSA.

**A.     The Interstate Commerce Commission Termination Act**

Congress has exercised broad regulatory authority over rail transportation for 122 years. In 1887, the Interstate Commerce Act ("ICA") created the Interstate Commerce Commission ("ICC"). The ICA was "among the most pervasive and comprehensive of federal regulatory schemes and has consequently presented recurring pre-emption questions from the time of its enactment." *Chi. & N. W. Transp. Co. v. Kalo Brick & Tile Co.*, 450 U.S. 311, 318 (1981). In January 1996, ICCTA abolished the ICC and replaced it with the Surface Transportation Board

9

("STB"), which continues to perform many of the functions formerly performed by the ICC. *See* ICC Termination Act of 1995, Pub. L. No. 104-88, 109 Stat. 803 (codified generally at 49 U.S.C. §§ 10101-16106). The STB is vested with broad jurisdiction over "transportation by rail carriers." 49 U.S.C. § 10501(b)(1). Generally speaking,

> ICCTA repealed much of the economic regulation previously conducted by the ICC and by state railroad regulators working in conjunction with the ICC. In so doing, Congress recognized that continuing state regulation – of intrastate rail rates, for example – would "risk the balkanization and subversion of the Federal scheme of minimal regulation for this intrinsically interstate form of transportation."

*Iowa, Chi. & E. R.R. Corp. v. Wash. County*, 384 F.3d 557, 559 (8th Cir. 2004) (quoting H.R. Rep. No. 104-311, at 96, *reprinted in* 1995 U.S.C.C.A.N. 793, 808).

ICCTA's jurisdictional provision also contains an express pre-emption clause – "the remedies provided under this part with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law." 49 U.S.C. § 10501(b).[8] Rail "transportation" is defined to include:

(A) a locomotive, car, vehicle, vessel, warehouse, wharf, pier, dock, yard,

---

[8] 49 U.S.C.§ 10501(b), stated in full, provides:
The jurisdiction of the Board over –

(1) transportation by rail carriers, and the remedies provided in this part with respect to rates, classifications, rules (including car service, interchange, and other operating rules), practices, routes, services, and facilities of such carriers; and

(2) the construction, acquisition, operation, abandonment, or discontinuance of spur, industrial, team, switching, or side tracks, or facilities, even if the tracks are located, or intended to be located, entirely in one State,

is exclusive. Except as otherwise provided in this part, the remedies provided under this part with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law.

*property, facility*, instrumentality, or equipment *of any kind related to the movement of passengers or property, or both, by rail*, regardless of ownership or an agreement concerning use; and (B) services related to that movement, including receipt, delivery, elevation, transfer in transit, refrigeration, icing, ventilation, storage, handling, and interchange of passengers and property.

49 U.S.C. § 10102(9) (emphasis added). ICCTA "preempts all 'state laws that may reasonably be said to have the effect of managing or governing rail transportation, while permitting the continued application of laws having a more remote or incidental effect on rail transportation.'" *N.Y. Susquehanna & W. Ry. Corp. v. Jackson*, 500 F.3d 238, 252 (3d Cir. 2007) (quoting *Fla. E. Coast Ry. Co. v. City of W. Palm Beach*, 266 F.3d 1324, 1331 (11th Cir. 2001)). The pre-emption inquiry focuses on "the degree to which the challenged regulation burdens rail transportation." *N.Y. Susquehanna*, 500 F.3d at 252.

The district court premised its pre-emption conclusion on its determination that a "rail crossing" falls within ICCTA's definition of "transportation" by rail carriers. 2007 WL 1851784, at *12 (citing 49 U.S.C. § 10501(b)). The court observed that the term "transportation" is defined broadly and includes "property . . . of any kind related to the movement of passengers or property, or both, by rail, regardless of ownership or an agreement concerning use." *Id.* (quoting 42 U.S.C. § 10102(9)). The court then employed its own definition of rail crossing – "an improvement to railroad tracks that allows vehicles, equipment, and persons to traverse the tracks." *Id.* According to the court, "[a]ny physical improvements made to railroad tracks – such as those made to construct a crossing – will necessarily impact and be involved in the movement of passengers and property passing over those tracks." *Id.* Thus, the court held that the rail crossing closure was within the STB's jurisdiction. *Id.*

The district court further noted that other courts have "long recognized Congress's

11

general intent to ensure the pervasive and comprehensive federal regulation of railroad operations, and the ICCTA's broad preemptive effect." *Id.* at *13. The court determined that the closure order was "not the type of predictable, generally applicable regulation that the [Second] Circuit envisioned withstanding the ICCTA's preemption clause." *Id.* (citing *Green Mountain*, 404 F.3d at 643).

In our view, the term rail "transportation" does not encompass the closure of this private rail crossing. Rail transportation does include "property . . . related to the movement of passengers or property . . . by rail," 49 U.S.C. § 10102(9)(A),[9] and a rail crossing does constitute "an improvement to railroad tracks that allows vehicles, equipment, and persons to traverse the tracks." 2007 WL 1851784, at *12. But we cannot conclude that *all* state action related to a railroad crossing is pre-empted. The appropriate questions are: what does the state seek to regulate and does the proposed regulation burden rail transportation?

Here, the state wants to terminate the use of a private roadway that traverses railroad tracks. New York does not seek to impose its authority over the tracks themselves or over "rail carriers" that use the tracks. Rather, the result of the state regulation at issue here is the termination of Island Park's use of the crossing. If we adopted a definition of rail transportation for pre-emption purposes that includes the movement of people and property *across* railroad tracks, then any entity – an automobile, bicycle or even a pedestrian passing over the crossing –

---

[9] We agree, however, with the district court that a rail crossing is not a rail "facility" under 49 U.S.C. § 10102(9). The court observed that ICCTA "does not define 'facility' or 'facilities' specifically to include grade crossings," and explained that "a facility is a structure designed to house specific operations, and not an improvement to the tracks that allows them to be crossed by traffic." 2007 WL 1851784, at *12. We concur and thus reject Island Park's argument to the contrary.

would arguably be beyond the reach of state regulatory authority.[10] NYSDOT's order closing the rail crossing does not "relate[] to" "the movement of passengers or property . . *by rail*." 49 U.S.C. § 10102(9)(A) (emphasis added).

To the extent there is an impact on rail transportation, it is confined to eliminating the risk of a collision between a train and one of Island Park's vehicles or equipment attempting to cross the tracks. As the ALJ noted, the Hudson Line entertains significant rail traffic, often including high speed trains. Because of that traffic and the poor sight distance caused by the curvature and elevation of the tracks, the ALJ determined that it was dangerous for Island Park's vehicles to cross the tracks. Instead of burdening rail transportation, *see N.Y. Susquehanna*, 500 F.3d at 252, the closure order facilitates rail transportation by removing a potential hazard.[11]

In a recent case from the Fifth Circuit, which noted "the paucity of precedent. . . relating to ICCTA preemption *vel non* for railroad crossings," the court held that ICCTA expressly pre-empted a property owner's state-law action to enjoin a railroad from removing four private railroad crossings on its right of way. *Franks Inv. Co. v. Union Pac. R.R. Co.*, 534 F.3d 443, 447 (5th Cir. 2008). The Fifth Circuit took the view that the case turned on "whether railroad crossings fit within the purview of 'transportation by rail carriers,' thereby evincing Congress' intent to preempt state-law claims relating to ownership of the crossings." *Id.* at 445-46. The court concluded that railroad crossings fell within ICCTA's pre-emption provision because they

---

[10] Such an expansive definition might even call into question state public safety laws that prohibit trespassing on railroad property. *See, e.g.*, N.Y. Penal Law § 140.10(g).

[11] We emphasize that this appeal does not require us to decide whether state regulation of rail crossings, as a general matter, is pre-empted under ICCTA. Because the limited state action in this case does not burden or interfere with rail transportation, it is not pre-empted. *See N.Y. Susquehanna*, 500 F.3d at 252.

met the "extremely broad" definition of transportation, which covered all "property . . . or equipment *of any kind* related to the movement of passengers or property, or both, by rail." *Id.* at 449 (quoting 49 U.S.C. § 10102(9)) (emphasis in original). The court also endorsed the district court's finding that "crossings affect safety, drainage, and maintenance, which necessarily affect rail travel," *id.* at 446, and cited the district court opinion in the present case for the proposition that rail crossings fall within the definition of rail "transportation." *Id.* But *Franks* involved a private individual's attempt to prevent a railroad from closing private rail crossings, thereby interfering with railroad operational decisions. This case, however, measures the ability of a state to order the closure of a crossing for safety reasons.

We think it important to emphasize that although ICCTA's pre-emption language is unquestionably broad, it does not categorically sweep up all state regulation that touches upon railroads – interference with rail transportation must always be demonstrated. For example, in *Friberg v. Kansas City S. Ry. Co.*, the Fifth Circuit held that ICCTA pre-empted a Texas "Anti-Blocking Statute" that prohibited a railroad from allowing a standing train to block a crossing for more than five minutes. 267 F.3d 439, 443-44 (5th Cir. 2001). The court explained that "[r]egulating the time a train can occupy a rail crossing impacts, in such areas as train speed, length and scheduling, the way a railroad operates its trains, with concomitant economic ramifications." *Id.* at 444.[12] However, several courts and the STB have declined to find pre-

---

[12] Island Park cites numerous cases where state regulation was pre-empted. However, each involved some form of interference with rail operations. *See, e.g.*, *Buffalo S. R.R. Inc. v. Vill. of Croton-On-Hudson,* 434 F. Supp. 2d 241, 248-49 (S.D.N.Y. 2006) (entering preliminary injunction in favor of rail carrier concerning its right to use leased property upon finding that ICCTA pre-empted local regulation and exercise of eminent domain power); *Wis. Cent. Ltd. v. City of Marshfield*, 160 F. Supp. 2d 1009, 1013 (W.D. Wis. 2000) (ICCTA pre-empted a city's use of condemnation authority over a railroad track as the city would be "exercising control -- the

14

emption where the state or local regulation does not interfere with rail operations. *See N.Y. Susquehanna*, 500 F.3d at 253-54 (holding that ICCTA does not pre-empt state regulation where the regulation does not unreasonably burden rail operations and does not discriminate against railroads); *Fla. E. Coast Ry. Co.*, 266 F.3d at 1326, 1339 (holding that ICCTA does not pre-empt a city's application of zoning and occupational license ordinances against the operations of a railroad lessee because it "does not constitute 'regulation of rail transportation'" and it "does not frustrate the objectives of federal railroad policy"); *Maumee & W. R.R. Corp. and RMW Ventures, LLC - Petition for Declaratory Order*, STB Finance Docket No. 34354, 2004 STB LEXIS 140, *3, 2004 WL 395835, *1 (S.T.B. March 2, 2004) (observing that "state and local regulation [affecting railroad property] is permissible where it does not interfere with interstate rail operations, and localities retain certain police powers to protect public health and safety"). In this case, Island Park simply cannot show that the state regulation at issue – the closure of a private rail crossing to a non-rail carrier – interferes with or burdens rail operations.

Finally, Island Park argues that our decision in *Green Mountain* supports the district court's decision. The district court took the view that the closure process constituted a lengthy administrative process, directed at a particular railroad crossing in which state officials were vested with broad discretion to determine the closure question. *See* 2007 WL 1851784, at *12. Citing *Green Mountain*, 404 F.3d at 643, the district court concluded that this was "not the type

---

most extreme type of control -- over rail transportation as it is defined in [49 U.S.C. §] 10102(9)"); *Burlington N. Santa Fe Corp. v. Anderson*, 959 F. Supp. 1288, 1294 (D. Mont. 1997) (ICCTA pre-empted state regulatory authority over railroad service agencies); *CSX Transp., Inc. v. Ga. Pub. Serv. Comm'n*¸ 944 F. Supp. 1573, 1581 (N.D. Ga. 1996) (same); *Burlington N. R.R. Co. v. Page Grain Co.*, 545 N.W.2d 749, 824 (Neb. 1996) (ICCTA pre-empted state court jurisdiction over rail carrier's rail service agencies).

15

of predictable, generally applicable regulation that [we] envisioned withstanding the ICCTA's preemption clause." 2007 WL 1851784, at *12.

In *Green Mountain*, a railroad sought to build trans-loading facilities on its property in Vermont. The State argued that this type of facility was subject to a state environmental land use statute mandating pre-construction permits. *See* 404 F.3d at 638, 640. We held that the pre-construction permit requirement was pre-empted by ICCTA because it "(i) unduly interfere[d] with interstate commerce by giving the local body the ability to deny the carrier the right to construct facilities or conduct operations; and (ii) it can be time-consuming, allowing a local body to delay construction of railroad facilities almost indefinitely." *Id.* at 643 (internal citation and quotation marks omitted). We recognized that

> states and towns may exercise traditional police powers over the development of railroad property, at least to the extent that the regulations protect public health and safety, are settled and defined, can be obeyed with reasonable certainty, entail no extended or open-ended delays, and can be approved (or rejected) without the exercise of discretion on subjective questions.

*Id.* We further noted that "[e]lectrical, plumbing and fire codes, direct environmental regulations enacted for the protection of the public health and safety, and other generally applicable, non-discriminatory regulations and permit requirements would seem to withstand preemption." *Id.* We explained that the legislative history of ICCTA supported this approach, noting "[a]lthough States retain the police powers reserved by the Constitution, the Federal scheme of economic regulation and deregulation is intended to address and encompass all such regulation and to be completely exclusive." *Id.* (quoting H.R. Rep. No. 104-311, at 96 (1995), *reprinted in* 1995 U.S.C.C.A.N. 793, 808). In *Green Mountain*, it was unnecessary for us to "draw a line that divide[d] local regulations between those that are preempted and those that are

16

not." *Id.* The state pre-construction permit law was pre-empted because it restrained the railroad "from development until a permit is issued; the requirements for the permit are not set forth in any schedule or regulation that the railroad can consult in order to assure compliance; and the issuance of the permit awaits and depends upon the discretionary rulings of a state or local agency." *Id.* Federal regulation of the railroad industry trumped local concerns that were vague, time consuming, and limited only by the discretion of local officials whose provincial concerns may not appreciate the need for the railroad's proposed action.

Although N.Y. Railroad Law § 97(3) vests NYSDOT with broad discretion to determine whether a rail crossing should be altered or closed, *Green Mountain* nevertheless does not control for one fundamental reason – the state action in this case does not interfere with railroad operations. *See N.Y. Susquehanna*, 500 F.3d at 252. In *Green Mountain*, we determined that "the proposed transloading and storage facilities [were] integral to the railroad's operation," and thus, the permit process "necessarily interfere[d] with Green Mountain's ability to construct facilities and conduct economic activities." 404 F.3d at 644 (internal citation and quotations omitted). No such operational interference exists here.

**B.    The Federal Railroad Safety Act**

Our holding that ICCTA does not pre-empt the state closure order is further supported by another federal statute – FRSA – that pertains to railroad safety and expressly addresses the issue of railroad crossings. *See* 49 U.S.C. § 20134 (entitled "Grade crossings and railroad rights of way"). In determining whether Congress intended to pre-empt state regulation of rail crossings, the district court erred in failing to consider the impact of FRSA.

In 1970, Congress enacted FRSA to "promote safety in every area of railroad operations

17

and to reduce railroad-related accidents and incidents." 49 U.S.C. § 20101 (formerly 45 U.S.C. § 434); *see generally CSX Transp.*, 507 U.S. at 661-662. To accomplish this purpose, FRSA confers authority upon the Secretary of Transportation to "prescribe regulations and issue orders for every area of railroad safety." 49 U.S.C. § 20103(a).[13] Recognizing that rail crossings have an inherently local tint, the statute specifically directs "the Secretary of Transportation [to] maintain a coordinated effort to develop and carry out solutions to the railroad grade crossing problem." *Id.* § 20134. FRSA also has an express pre-emption provision that contemplates continued state regulation of railroad safety. *See* 49 U.S.C. § 20106. The statute begins by providing that the "Laws, regulations, and orders related to railroad safety . . . shall be nationally uniform to the extent practicable." 49 U.S.C. § 20106(a)(1). The statute permits a state to "adopt or continue in force a law, regulation, or order related to railroad safety . . . until the Secretary of Transportation (with respect to railroad safety matters) . . . prescribes a regulation or issues an order *covering* the subject matter of the State requirement." *Id.* (emphasis added). The statute also allows a state to "adopt or continue in force an additional or more stringent law, regulation, or order related to railroad safety . . . when the law, regulation, or order - (A) is necessary to eliminate or reduce an essentially local safety or security hazard; (B) is not incompatible with a law, regulation, or order of the United States Government; and (C) does not unreasonably burden interstate commerce." 49 U.S.C. § 20106(a)(2). The Supreme Court has indicated that regulations issued by the Secretary of Transportation that merely "touch upon" or "relate to" the same subject matter as a state safety law are insufficient to establish pre-emption

---

[13] The Administrator of the Federal Railroad Administration "shall carry out . . . (1) duties and powers related to railroad safety vested in the Secretary [of Transportation]." 49 U.S.C. § 103(g)(1).

18

because "'covering' is a more restrictive term which indicates that pre-emption will lie only if the federal regulations substantially subsume the subject matter of the relevant state law." *CSX Transp.*, 507 U.S. at 664.

Several circuits that have examined the interplay between ICCTA and FRSA have concluded that the federal statutory scheme places principal federal regulatory authority for rail safety with the Federal Railroad Administration ("FRA"), not the STB. We agree. Thus, FRSA provides the appropriate basis for analyzing whether a state law, regulation or order affecting rail safety is pre-empted by federal law. *See, e.g.*, *Boston & Me. Corp. v. Surface Transp. Bd.*, 364 F.3d 318, 321 (D.C. Cir. 2004); *Iowa, Chi. & E. R.R. Corp.*, 384 F.3d at 561; *Tyrrell v. Norfolk S. Ry. Co.*, 248 F.3d 517, 523 (6th Cir. 2001).

In *Tyrrell*, the Sixth Circuit reversed a district court decision concluding that ICCTA pre-empted an Ohio track clearance regulation that the plaintiff used as a basis for his negligence per se claim under the Federal Employers' Liability Act ("FELA"). 248 F.3d at 520. The district court had viewed the Ohio statute as primarily a "construction requirement" and limited its analysis to ICCTA's pre-emption provision, 49 U.S.C. § 10501(b). *Tyrrell*, 248 F.3d at 521. That section provides the STB with exclusive jurisdiction to regulate rail carriers' construction and operation of rail switches, side tracks, and facilities. *Id.* at 521. The district court indicated that even if it assumed the state regulation addressed workplace safety, ICCTA was still the proper statute for pre-emption analysis because one of the express purposes of ICCTA was to encourage safe and suitable working conditions in the railroad industry. *Id.*

The Sixth Circuit recognized that "the STB must adhere to federal policies encouraging 'safe and suitable working conditions in the railroad industry,'" but concluded that "ICCTA and

19

its legislative history contain no evidence that Congress intended for the STB to supplant the FRA's authority over rail safety." *Id.* at 523 (quoting 49 U.S.C. § 10101(11)). The court determined that the STB and the FRA's "complementary exercise of their statutory authority accurately reflects Congress's intent for the ICCTA and FRSA to be construed in *pari materia*." *Id.* The court concluded:

> Based on the federal railway statutes, the STB and FRA's jurisdictional
> management, and the resulting regulatory systems, Congress vested the FRA with
> primary authority over national rail safety policy and assigned the STB the duty to
> encourage "safe and suitable working conditions" for railway employees through
> its assessment of individual railway proposals subject to its authority. As
> statutory "repeals by implication are disfavored" and there is no positive
> repugnancy between FRSA and the ICCTA's jurisdictional provisions, this
> statutory construction properly reflects Congress's purpose.

*Id.* Accordingly, the *Tyrrell* court held that FRSA "provides the applicable standard for assessing federal preemption" of the state rail safety law. *Id.* at 524.

Similarly, in *Iowa, Chi. & E. R.R.*, the Eighth Circuit rejected a railroad's argument that an Iowa statute requiring it to pay for the replacement of four bridges (two carrying the rail line over a highway and two carrying the highway over the rail line) was pre-empted by ICCTA. The railroad argued that the state statute was an "expressly preempted economic regulation," and, to the extent it pertained to rail bridges over the highway, it impermissibly regulated rail "facilities." 384 F.3d at 559. The Eighth Circuit characterized this argument as "deceptively simple" because it "ignore[d] relevant federal statutes that were enacted before ICCTA, that are administered by one or more agencies other than the ICC or the STB, and that Congress left intact in enacting ICCTA." *Id.* at 559.[14] The court further recognized that "Congress for many decades has forged

_____

[14] The court found "unpersuasive" the railroad's argument that the bridges were being replaced for reasons of "highway improvement," and not "rail safety." *Id.* at 560. The court

20

a *federal-state regulatory partnership* to deal with problems of *rail* and highway *safety* and highway improvement in general, and the repair and replacement of deteriorated or obsolete railway-highway bridges in particular," which ICCTA did not address. *Id.* at 561 (emphasis added). Thus, the court concluded that ICCTA's "silence cannot reflect the requisite 'clear and manifest purpose of Congress' to preempt traditional state regulation of public roads and bridges that Congress has encouraged in numerous other statutes." *Id.*

In the present case, it is abundantly clear that the closure order sufficiently implicates rail safety concerns such that FRSA and not ICCTA is the principal governing statute in determining whether state authority is pre-empted. As noted earlier, FRSA allows states to impose rail safety requirements as long as they are not inconsistent with federal mandates. Island Park points to no federal rail safety regulation that covers rail crossing closures. Accordingly, the state closure order is not pre-empted by FRSA.

## II.    Island Park's Alternate Grounds for Affirmance

As alternate grounds for affirming the district court, Island Park argues that the State Defendants deprived it of its property interest in the crossing without due process of law and that the closure order effectuated a "taking" of its property without just compensation. Specifically, as to due process, it asserts that because the State did not also initiate condemnation proceedings

---

stated that "[t]he reasons for replacing the bridges as stated in the stipulated record clearly include a safety component." *Id.* The court further concluded that if the railroad was "arguing that 'rail safety' for purposes of FRSA preemption does not include the highway safety risks created at rail crossings, that cramped reading of the FRSA is inconsistent with 49 U.S.C. § 20134(a), with the federal rail crossing regulations discussed [by the Supreme Court] in *Easterwood*, and with common sense." *Id.* The court noted that "[m]ore importantly, the argument ignores other federal statutes that specifically address the problem of deteriorating or inadequate railway-highway bridges." *Id.*

21

under the New York Eminent Domain Procedure Law ("EDPL"),[15] the closure of the crossing violated due process.

**A.     Due Process**

Island Park's due process argument erroneously conflates two distinct state law procedures – the condemnation proceedings set forth in EDPL and the rail crossing alteration/closure proceedings in N.Y. Railroad Law § 97(3).  The question of whether the closure order at issue was entered pursuant to a process that comported with due process is one separate from whether the crossing closure was *also* a "taking" triggering state condemnation proceedings.  Island Park cannot demonstrate that its due process rights were violated in the closure proceeding context by simply alleging that NYSDOT did not *additionally* initiate a condemnation proceeding under EDPL.  In any event, this claim is more properly directed to a New York state court in a proceeding for judicial review under article 78 of the N.Y. Civil Practice Law and Rules – a remedy Island Park has already invoked.  *See Hellenic Am. Neighborhood Action Comm. v. City of New York,* 101 F.3d 877, 881-82 (2d Cir. 1996).[16]

To the extent Island Park's argument can be viewed as a challenge to the constitutional adequacy of the procedures set forth in N.Y. Railroad Law § 97(3), the argument lacks merit. Island Park was clearly afforded pre-deprivation notice and an opportunity to be heard.  The record before us demonstrates that NYSDOT conducted four days of hearings on the question of

---

[15] N.Y. Railroad Law § 97(5) authorizes the NYSDOT Commissioner "to acquire any real property, easements, rights-of-way or similar rights necessary for the purposes of this article in the same manner as property is acquired for state highway purposes" pursuant to N.Y. Highway Law § 30 and EDPL.

[16] As of the filing of this opinion, that matter remains pending before the Appellate Division, Third Department.

22

whether the rail crossing "should be altered or closed and discontinued." In those proceedings, Island Park appeared with counsel, cross-examined witnesses, presented evidence, and submitted memoranda in support of its position. Island Park does not point to any additional procedural safeguard that would have enhanced the decision-making process. The pre-deprivation notice and extensive hearings gave Island Park ample opportunity to be heard at a meaningful time and in a meaningful manner. *See generally Matthews v. Eldridge*, 424 U.S. 319, 335 (1976); *Brody v. Vill. of Port Chester*, 434 F.3d 121, 136 (2d Cir. 2005).

**B.      Takings**

We have previously held that a takings claim is not ripe if "a remedy potentially is available under the state constitution's provision." *Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 380 (2d Cir. 1995); *see also Williamson County Reg'l Planning Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172, 187-88 (1985). Before a federal takings claim can be asserted, compensation must first be sought from the state if it has a "'reasonable, certain and adequate provision for obtaining compensation.'" *Villager Pond*, 56 F.3d at 379-80 (quoting *Williamson*, 473 U.S. at 194). A plaintiff must pursue "relief under a state compensation procedure . . . even where it remains unsure and undeveloped." *Id.* at 380 (internal quotations marks omitted). "Ripeness is a jurisdictional inquiry," and thus we must consider it at the outset. *Murphy v. New Milford Zoning Comm'n*, 402 F.3d 342, 347 (2d Cir. 2005).

Under the New York State Constitution, "[p]rivate property shall not be taken for public use without just compensation." N.Y. Const., Art. I, § 7(a). State law vests the Court of Claims with jurisdiction to determine claims arising from the acquisition of real property by the State of New York. *See* N.Y. Em. Dom. Proc. Law § 501(A). Assuming for purposes of this argument

23

that the closure order effectuated a "taking," the district court properly rejected Island Park's claim as unripe because it failed to seek compensation from the State before commencing this action.

**CONCLUSION**

New York State's closure of this private rail crossing does not burden railroad operations and therefore does not fall within the definition of "transportation" on the ground that it is "property . . . related to the movement of passengers or property . . .by rail." 49 U.S.C. § 10102(9)(A). The exercise of state authority to close the rail crossing at issue pursuant to N.Y. Railroad Law § 97(3) is not pre-empted under ICCTA or FRSA.

Accordingly, the judgment of the district court is REVERSED and the case is REMANDED to the district court (1) so that it may enter summary judgment in favor of defendants CSX Transportation Inc., Consolidated Rail Corporation and Amtrak, and defendants Madison and Cottrell on Island Park's pre-emption claim, and (2) for further proceedings on Island Park's fourth claim.