[No. A133559. First Dist., Div. Five. Oct. 16, 2012.]

THE PEOPLE, Plaintiff and Respondent, v.
BURLINGTON NORTHERN SANTA FE RAILROAD, Defendant and
Appellant.

1514

**COUNSEL**

Latham & Watkins, Karl S. Lytz, Andrea M. Hogan and C. Genevieve Jenkins for Defendant and Appellant.

Randy Riddle, City Attorney, Trisha A. Aljoe, Special Counsel; Moscone Emblidge & Sater, G. Scott Emblidge and Sylvia M. Sokol for Plaintiff and Respondent.

**OPINION**

**BRUINIERS, J.**—General order No. 135 of the Public Utilities Commission (PUC) regulates the length of time a stopped railroad train may block public grade crossings. Appellant Burlington Northern Santa Fe Railroad (BNSF) was convicted, after a bench trial, of a misdemeanor violation of that order. (Pub. Util. Code, § 2110.)[1] BNSF appeals the conviction.

The question we address is whether the PUC general order on which the conviction is based is preempted by either the Interstate Commerce Commission Termination Act (ICCTA; 49 U.S.C. § 10101 et seq.) or the

---

[1] Public Utilities Code section 2110 provides: "Every public utility . . . who violates or fails to comply with, or who procures, aids, or abets any violation by any public utility of any provision of the Constitution of this state or of this part, or who fails to comply with any part of any order, decision, rule, direction, demand, or requirement of the commission . . . is guilty of a misdemeanor and is punishable by a fine not exceeding one thousand dollars ($1,000), or by imprisonment in a county jail not exceeding one year, or by both such fine and imprisonment."

Federal Railroad Safety Act of 1970 (FRSA; 49 U.S.C. § 20101 et seq.). The trial court found the order not to be preempted by either the ICCTA or the FRSA. We conclude that PUC general order No. 135 is preempted by federal law and, accordingly, reverse the judgment.

## I. STATUTORY BACKGROUND

Congress has exercised "broad regulatory authority" over railroads for more than a century. (*Island Park, LLC v. CSX Transportation* (2d Cir. 2009) 559 F.3d 96, 102 (*Island Park*).) The Interstate Commerce Commission, created by the Interstate Commerce Act (Feb. 4, 1887, ch. 104, 24 Stat. 379) in 1887, was abolished by the ICCTA in January 1996, and the Surface Transportation Board (STB) was created in its stead. (*Island Park*, at p. 102; *Friberg v. Kansas City Southern Railway Co.* (5th Cir. 2001) 267 F.3d 439, 442 (*Friberg*).) The purpose of the ICCTA was to "eliminate many outdated, unnecessary, and burdensome regulatory requirements and restrictions on the rail industry." (Sen.Rep. No. 104-176, 1st Sess., p. 6 (1995).) To that end, the ICCTA includes a broadly worded express preemption provision. It provides: "The jurisdiction of the [STB] over—[¶] (1) transportation by rail carriers, and the remedies provided in this part [(49 U.S.C. § 10101 et seq.)] with respect to rates, classifications, rules (including car service, interchange, and other operating rules), practices, routes, services, and facilities of such carriers; and [¶] (2) the construction, acquisition, operation, abandonment, or discontinuance of spur, industrial, team, switching, or side tracks, or facilities, even if the tracks are located, or intended to be located, entirely in one State, [¶] is exclusive. Except as otherwise provided in this part, *the remedies provided under this part with respect to regulation of rail transportation are exclusive* and preempt the remedies provided under Federal or State law." (49 U.S.C. § 10501(b), italics added.)

■ The FRSA was enacted, in 1970, "to promote safety in every area of railroad operations and reduce railroad-related accidents and incidents." (49 U.S.C. § 20101; see *Island Park, supra*, 559 F.3d at p. 106.) Thereunder, Congress authorized the Secretary of Transportation to "prescribe regulations and issue orders for every area of railroad safety." (49 U.S.C. § 20103(a).) The secretary delegated the authority to "[c]arry out the[se] functions" to the Federal Railroad Administration. (49 C.F.R. § 1.89(a) (2012).) The FRSA contains a more narrow preemption provision. It provides: "National uniformity of regulation.—(1) Laws, regulations, and orders *related to railroad safety* and laws, regulations, and orders related to railroad security shall be nationally uniform to the extent practicable. [¶] (2) *A State may adopt or continue in force a law*, regulation, or order related to railroad safety or security *until the Secretary of Transportation . . . prescribes a regulation or issues an order covering the subject matter of the State requirement.* A State

may adopt or continue in force an additional or more stringent law, regulation, or order related to railroad safety or security when the law, regulation, or order—[¶] (A) is necessary to eliminate or reduce an essentially local safety or security hazard; [¶] (B) is not incompatible with a law, regulation, or order of the United States Government; and [¶] (C) does not unreasonably burden interstate commerce." (49 U.S.C. § 20106(a), italics added & some capitalization omitted.) The United States Supreme Court has held that a "covering" federal regulation must do more than merely " 'touch upon' or 'relate to' " the same subject matter as state law. "[P]re-emption [under the FRSA] will lie only if the federal regulations substantially subsume the subject matter of the relevant state law." (*CSX Transp., Inc. v. Easterwood* (1993) 507 U.S. 658, 664 [123 L.Ed.2d 387, 113 S.Ct. 1732] (*Easterwood*).)

The state law at issue in this case is PUC general order No. 135, which is titled: "Regulations Governing the Occupancy of Public Grade Crossings by Railroads." (Some capitalization omitted.) General order No. 135 states: "IT IS ORDERED . . . that each railroad corporation operating in the state of California shall observe the following regulations in conducting operations on and across public grade crossings: [¶] 1. TRAIN MOVEMENTS—Except as provided in Paragraph 5, a public grade crossing which is blocked by a stopped train . . . must be opened within 10 minutes, unless no vehicle or pedestrian is waiting at the crossing. . . . [¶] . . . [¶] 4. There are no time restrictions for crossing occupancy for a moving train continuing in the same direction. [¶] 5. These time limit provisions shall not apply to any blocking resulting from compliance with State and Federal laws and regulations, terrain and physical conditions, adverse weather conditions, conditions rendering the roadbed or track structure unsafe, mechanical failures, train accidents, or other occurrences over which the railroad has no control, except that such crossing shall be cleared with reasonable dispatch. [¶] . . . [¶] 10. The district attorney of the proper county or the city attorney designated to prosecute misdemeanors in his stead shall prosecute noncompliance with this General Order by means of a misdemeanor complaint issued against the railroad corporation in accordance with Chapter 11, Part I, Division I of the Public Utilities Code."

## II. Factual and Procedural Background

BNSF is a railroad company engaged in shipping industrial and consumer products across 26 states. On February 6, 2009, BNSF was charged, by the City of Richmond acting on behalf of the People, with two misdemeanor violations of general order No. 135. In relevant part, the complaint alleged that, on December 16, 2008, BNSF violated that order by blocking intersections at Harbor Way South and Marina Way South, in Richmond, for greater

than 20 minutes.[2] BNSF filed a demurrer, arguing that the FRSA and the ICCTA preempted general order No. 135. The demurrer was overruled on the ground that factual development was necessary. BNSF's petition for writ of mandate, challenging the trial court's decision on the demurrer, was denied.

Both parties waived the right to a trial by jury, and the following evidence was presented during the bench trial. The Union Pacific main line (UP Line) brings trains from the north and east, through Richmond, to Oakland and points beyond. Another track, controlled by BNSF, runs off the UP Line, running through a more western part of Richmond. It includes a rail yard called the "Richmond Yard," which is operated by BNSF. This track carries cargo trains from various points heading to the Port of Oakland. Another track, called the "Siberia Lead," connects the Richmond Yard to the UP Line. Trains from the Siberia Lead enter the UP Line at the "Stege Intersection."

BNSF needs permission from Union Pacific in order for its trains to enter the UP Line, which is obtained by radioing to a Union Pacific dispatcher. The dispatcher only gives clearance if it is expected that the train will be able to actually enter the UP Line, but intervening events can make that impossible. Accordingly, there is a signal light on the rail line at the Stege Intersection that is sometimes red when the train arrives, even though clearance was given by Union Pacific. This occurs about 15 percent of the time and delays can last between a few minutes and two hours.

On the morning of December 16, 2008, there were two BNSF trains trying to travel from the Richmond Yard to the West Oakland Yard—BNSF Train 842 and BNSF Train 5400. The first train, Train 842, received clearance from the Union Pacific dispatcher to proceed to the Stege Intersection at 9:48 a.m. Train 5400 was aware that there was another train ahead of it, but asked permission to follow Train 842 and "wait our turn." At 9:56 a.m., the Union Pacific dispatcher gave Train 5400 permission to follow Train 842 to the Stege Intersection. Train 5400 also received clearance to proceed from the Richmond Yard, the West Oakland Yard, and the Richmond Pacific Railroad, which conducts operations on the Siberia Lead.

At 10:04 a.m., Train 842 arrived at the Stege Intersection and found a red light. Train 842 waited. It was not blocking any crossings because it was about 5,000 feet long and the distance from the intersection to the nearest crossing was 5,200 feet. Meanwhile, shortly after 9:56 a.m., Train 5400 left the Richmond Yard and then stopped on the Siberia Lead to change a track switch to take the train in the proper direction. When Train 5400 stopped, its conductor first saw that Train 842 was stopped at the Stege Intersection.

---

[2] The second count was dismissed at trial on the People's motion.

Because Train 5400 was about 5,000 feet long, it was blocking two grade crossings, one at Marina Way South and one at Harbor Way South. The conductor radioed for a van to pick him up to take him to the rear of the train, so that he could "back up" the train. The van did not arrive for 25 minutes. Eventually, around 11:29 a.m., the conductor arrived at the rear of the train and the blockage was cleared.

After posttrial briefing, the trial court found BNSF guilty of violating general order No. 135. In its special verdict on issues of fact/order resolving issues of law (special verdict), the trial court wrote: "[BNSF Train 5400] blocked two intersections from some time before 10:30 a.m. to some time after 11:29 a.m., a minimum of 59 minutes, and vehicles were present during that time. The blockage was not the result of adverse track conditions, weather, mechanical failure, terrain or other physical conditions."

The trial court also concluded that general order No. 135 was not preempted by either the ICCTA or the FRSA, reasoning as follows: "1. Preemption must be analyzed under the FRSA, not the ICCTA. The FRSA expressly permits state regulation where the Federal Railroad Administration has not issued a requirement 'covering' the same subject matter, or even if it has, where the state regulates an 'essentially local safety hazard.' [¶] 2. The Federal Railroad Administration has not issued any requirements that cover the subject matter of grade-crossing blockages. [¶] 3. [General order No.] 135 is a permissible regulation of an essentially local safety hazard. [¶] 4. [General order No.] 135 does not conflict with any federal requirements. [¶] 5. The blockage occurred after a train had been cleared to proceed through the Stege Intersection but instead received a red light and was required to stop. That train did not block any intersections, but a second train following behind it did. The blockage was caused by [BNSF's] decision to send two trains to the Stege Intersection, knowing that there was a reasonable chance that the first train would receive a red light, and that if it did, the second train would block intersections. Thus, the blockage was not caused by an occurrence beyond [BNSF's] control, or by compliance with federal requirements. [¶] The Court has concluded that the People have proven beyond a reasonable doubt that the blockage violated [general order No.] 135. As applied to the facts of this case, the provisions of [general order No.] 135 do not violate and are not preempted by either the FRSA or the ICCTA."

On November 4, 2010, the trial court ordered BNSF to pay a fine of $1,000 and restitution/court fees of $170. BNSF appealed to the appellate division of the superior court.[3] On BNSF's application for transfer, the appellate division of the superior court certified the case for transfer to the

_____

[3] In a misdemeanor case, appeal is to the appellate division of the superior court. (Pen. Code, § 1466.)

Court of Appeal. We then ordered the case transferred to settle an important question of law. (Pen. Code, § 1471; Cal. Rules of Court, rules 8.1002, 8.1005(a)(1).)

## III. Discussion

BNSF does not take issue with the trial court's factual findings or suggest that it did not violate general order No. 135. Instead, BNSF contends that the trial court erred in concluding that neither the ICCTA nor the FRSA preempts general order No. 135. Specifically, BNSF argues: "[E]ach of the Superior Court's legal interpretations is the exact opposite of Congress' intent, and would require major changes in railroad operating procedures (e.g., shorter or faster and more frequent trains) that would have huge impacts on railroad economics. The Superior Court's decision could also result in a patchwork of differing state and local antiblocking regulations across the nation that would actually *decrease* rather than increase rail safety."

No California Court of Appeal has previously considered whether the ICCTA or FRSA preempts general order No. 135. When the facts are undisputed, preemption is a question of law. We review such questions de novo. (*Farm Raised Salmon Cases* (2008) 42 Cal.4th 1077, 1089, fn. 10 [72 Cal.Rptr.3d 112, 175 P.3d 1170] [preemption resolved on demurrer]; *Wholesale Electricity Antitrust Cases I & II* (2007) 147 Cal.App.4th 1293, 1304 [55 Cal.Rptr.3d 253] [same].) We conclude that general order No. 135 is preempted by the ICCTA.

A.  *General Preemption Principles*

■   The supremacy clause states: "[The United States] Constitution, and the Laws of the United States . . . made in Pursuance thereof; . . . shall be the supreme Law of the Land; . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." (U.S. Const., art. VI, cl. 2.) The doctrine of preemption gives force to the supremacy clause. Thus, when "a state statute conflicts with, or frustrates, federal law, the former must give way." (*Easterwood, supra*, 507 U.S. at p. 663; accord, *Maryland v. Louisiana* (1981) 451 U.S. 725, 746–747 [68 L.Ed.2d 576, 101 S.Ct. 2114].)

■   The United States Supreme Court has recognized three types of preemption under the supremacy clause: express preemption, conflict preemption, and field preemption. (See *Gade v. National Solid Wastes Management Assn.* (1992) 505 U.S. 88, 98 [120 L.Ed.2d 73, 112 S.Ct. 2374].) "Federal preemption 'fundamentally is a question of congressional intent . . . .' [Citation.] 'Pre-emption occurs when Congress, in enacting a federal statute, expresses a clear intent to pre-empt state law, [citation], when there is

outright or actual conflict between federal and state law, [citation], where compliance with both federal and state law is in effect physically impossible, [citation], where there is implicit in federal law a barrier to state regulation, [citation], where Congress has legislated comprehensively, thus occupying an entire field of regulation and leaving no room for the States to supplement federal law, [citation], or where the state law stands as an obstacle to the accomplishment and execution of the full objectives of Congress. [Citation.]' [Citation.]" (*Carrillo v. ACF Industries, Inc.* (1999) 20 Cal.4th 1158, 1162 [86 Cal.Rptr.2d 832, 980 P.2d 386].)

██  Because the ICCTA and the FRSA contain express preemption provisions (49 U.S.C. §§ 10501(b), 20106(a)), "the task of statutory construction must in the first instance focus on the plain wording of the clause[s], which necessarily contain[] the best evidence of Congress' pre-emptive intent." (*Easterwood, supra*, 507 U.S. at p. 664.) But "our interpretation of that language does not occur in a contextual vacuum." (*Medtronic, Inc. v. Lohr* (1996) 518 U.S. 470, 485 [135 L.Ed.2d 700, 116 S.Ct. 2240].) "First, because the States are independent sovereigns in our federal system, we have long presumed that Congress does not cavalierly pre-empt state-law causes of action. In all pre-emption cases, and particularly in those in which Congress has 'legislated . . . in a field which the States have traditionally occupied,' [citation], we 'start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.' [Citations.] . . . [¶] . . . . . . Also relevant . . . is the 'structure and purpose of the statute as a whole,' [citation], as revealed not only in the text, but through the reviewing court's reasoned understanding of the way in which Congress intended the statute and its surrounding regulatory scheme to affect business, consumers, and the law." (*Id.* at pp. 485–486.) " '[T]he purpose of Congress is the ultimate touchstone' . . . . [Citations.]" (*Id.* at p. 485.)

Thus, we consider whether Congress has expressed its "clear and manifest purpose" to preclude the regulation at issue in general order No. 135.

### B. *Which Statute Governs the Preemption Analysis*

First, we must consider whether the trial court erred in concluding that the focus should be on the FRSA only, and not on the ICCTA, in construing congressional intent to preempt general order No. 135. In its special verdict, the trial court explained its reasoning: "[I]n *Tyrrell v. Norfolk Southern* [*Railway Co.*] (6th Cir. 2001) 248 F.3d 517, plaintiff sued the railway in tort for injuries sustained while working, basing his claim on the railroad's alleged violation of a state train safety standard. The railroad argued that application of the state law, even in tort, was preempted by the ICCTA. The

court, however, found that the ICCTA was not intended to create, in essence, an implied repeal of the FRSA and its preemption provisions, which allow state regulation under specified circumstances. . . . [¶] . . . [¶] This Court finds the *Tyrrell* view persuasive, because it harmonizes the very specific provisions of the FRSA with the more general provisions of the ICCTA. . . . Nothing indicates that Congress intended to abrogate the considered and specific treatment of preemption of state authority to regulate safety reflected in [the] FRSA. As noted above, courts finding preemption under the ICCTA have not thoroughly discussed the 'harmonization' problem, or found that the state law in question did not address 'safety' issues within the ambit of the FRSA. No court . . . has specifically rejected the *Tyrrell* approach. Thus, while [BNSF] asserts that 'every jurisdiction to have considered the issue has held that the ICCTA preempts state and local antiblocking laws,' this is not technically correct. Most courts to consider preemption have found that any preemption arises from the FRSA, not the ICCTA, and this Court agrees."

We believe that the trial court misplaced its reliance on *Tyrrell v. Norfolk Southern Railway Co., supra,* 248 F.3d 517 (*Tyrrell*), in concluding that the FRSA governed the preemption analysis in this case. *Tyrrell* did not involve an antiblocking law. In *Tyrrell,* a trainman for Norfolk Southern Railway Company sued his employer after he was hit by a train while walking between two tracks. (248 F.3d at p. 520.) The plaintiff relied on an Ohio track clearance regulation as the basis for his negligence per se claim. His employer argued that the Ohio regulation was preempted by the ICCTA. (248 F.3d at p. 520.)

The Sixth Circuit concluded that the ICCTA was not the proper statute for preemption analysis. (*Tyrrell, supra,* 248 F.3d at pp. 523–524.) The *Tyrrell* court observed: "[T]he district court's decision erroneously preempts state rail safety law that is saved under FRSA *if it tangentially touches* upon an economic area regulated under the ICCTA. As a result, this interpretation of the ICCTA implicitly repeals FRSA's first saving clause. [¶] While the STB must adhere to federal policies encouraging 'safe and suitable working conditions in the railroad industry,' the ICCTA and its legislative history contain no evidence that Congress intended for the STB to supplant the [Federal Railroad Administration's] authority over rail safety. [Citation.] Rather, the agencies' complementary exercise of their statutory authority accurately reflects Congress's intent for the ICCTA and FRSA to be construed *in pari materia.* . . . [¶] . . . [¶] While [the Ohio regulation] references rail construction, its 14-foot track clearance requirement yields safety benefits for employees working along switching tracks. . . . *As the Ohio regulation has a connection with rail safety based on its terms, the safety benefits of compliance, and its legally recognized purpose, FRSA provides the applicable standard for assessing federal preemption.*" (*Tyrrell,* at pp. 522–524, italics added & omitted.)

■ In determining which federal statute presents the best fit for preemption analysis, we cannot agree with our concurring colleague that we must look at all the effects of complying with the local regulation and, if there is any connection to rail safety at all, no matter how tangential, the FRSA governs. In our view, the rule derived from *Tyrrell* is simply that the "FRSA provides the appropriate basis for analyzing whether a state law, regulation or order [primarily] affecting *rail safety* is pre-empted by federal law." (*Island Park, supra,* 559 F.3d at p. 107, italics added, citing *Tyrrell, supra,* 248 F.3d at p. 523; see *Boston and Maine Corp. v. Surface Transportation Bd.* (D.C. Cir. 2004) U.S. App.D.C. 94 [364 F.3d 318, 321] 361; *Iowa, Chicago & Eastern Railroad Corp. v. Washington County, Iowa* (8th Cir. 2004) 384 F.3d 557, 561 (*IC&E Railroad*).)[4] In this case, we actually confront the flip side of the issue presented in *Tyrrell.* In *Tyrell,* the Ohio regulation had a tangential relation to railroad economics. (*IC&E,* at pp. 523–524.) In this case, general order No. 135 only tangentially relates to rail safety. Nonetheless, we agree with the *Tyrrell* court that, when a local or state regulation affects both railroad operations and railroad safety, we look for the best fit in preemption analysis. We doubt that Congress expected us to overlook the primary goal and effects of such regulation and focus instead on its tangential impacts. (See *Tyrrell, supra,* 248 F.3d at p. 523.)

■ As noted *ante,* 49 United States Code section 10501(b) provides that the STB has exclusive jurisdiction, and provides preemptive remedies, with respect to "regulation of rail transportation." "Transportation" is defined to include "a locomotive, car, vehicle, vessel, warehouse, wharf, pier, dock, yard, property, facility, instrumentality, or equipment of any kind related to the movement of passengers or property, or both, by rail," as well as "services related to that movement, including receipt, delivery, elevation, transfer in transit, refrigeration, icing, ventilation, storage, handling, and interchange of passengers and property." (49 U.S.C. § 10102(9).) "[A]lthough ICCTA's pre-emption language is unquestionably broad, it does not categorically sweep up all state regulation that touches upon railroads[—]*interference with rail transportation must always be demonstrated.*" (*Island Park, supra,*

---

[4] None of these cases involved an antiblocking statute. In all of the *post-Tyrrell* cases relied on by the People and the trial court, the FRSA governed preemption analysis when *railroad safety* was primarily at issue. (*Southern California Regional Rail Authority v. Superior Court* (2008) 163 Cal.App.4th 712, 715, 730–738 [77 Cal.Rptr.3d 765] [negligence claims following train derailment]; *Island Park, supra,* 559 F.3d at p. 108 ["it is abundantly clear that the [order closing a crossing for safety reasons] sufficiently implicates rail safety concerns such that FRSA and not ICCTA is the principal governing statute in determining whether state authority is pre-empted"]; *Boston and Maine Corp. v. Surface Transportation Bd., supra,* 364 F.3d at p. 321 [discussing, but not deciding, whether FRSA preempts STB's orders authorizing trains to operate at speeds of up to 79 m.p.h.]; *Nippon Yusen Kaisha v. Burlington and Northern Santa Fe Railway Co.* (C.D.Cal. 2005) 367 F.Supp.2d 1292, 1302, fn. 10 [negligence claim involving train crash].)

559 F.3d at p. 104, italics added.) The FRSA, on the other hand, "relate[s] to railroad safety." (49 U.S.C. § 20106(a).) The People argue that general order No. 135 is aimed at "safety" and that the FRSA, and not the ICCTA, is the correct statute to analyze whether the order is preempted by federal law. BNSF, on the other hand, contends that general order No. 135 has "marginal impacts on railroad safety but significant impacts on ICCTA issues (such as railroad operating procedures, schedules and economics)."

In determining whether general order No. 135 primarily relates to "regulation of rail transportation" or "railroad safety" (49 U.S.C. §§ 10501(b), 20106(a)(1)), we consider the order's terms, benefits of compliance, and legally recognized purpose. (*Tyrrell, supra*, 248 F.3d at p. 524.) General order No. 135 is titled: "Regulations Governing the Occupancy of Public Grade Crossings by Railroads." (Some capitalization omitted.) General order No. 135 goes on to provide: "IT IS ORDERED . . . that each railroad corporation *operating* in the state of California shall observe the following regulations *in conducting operations* on and across public grade crossings: [¶] 1. *TRAIN MOVEMENTS*—Except as provided in Paragraph 5, a public grade crossing which is blocked by a stopped train . . . *must be opened within 10 minutes . . . .*" (Italics added.) And evidence was presented to show that enforcement of general order No. 135 will necessarily impact both scheduling and the length of BNSF trains. BNSF presented evidence that the distance from the Stege Intersection to the closest grade crossing is only 5,200 feet and that the majority of its trains are approximately 7,000 feet long. Thus, if a train is stopped at the Stege Intersection, the closest grade crossing will necessarily be blocked if the train is longer than 5,200 feet.[5] By its clear terms and effects of compliance, general order No. 135 regulates how trains operate on railroad tracks.

In considering whether general order No. 135 should be promulgated, the PUC cited " 'chaotic traffic conditions' " and isolation of communities caused by blocked crossings—clearly local "safety" issues. But the PUC also cited, without any further discussion or explanation, a hearing officer finding "that the regulation of blocking affects the safety of operations of railroads." (Cal.P.U.C. Interim Opinion on Submission of Commission Investigation into Regulations of Resolution No. S-1278 (Aug. 14, 1973) [1973 WL 31849, p. *4].) We believe the tangential nature of the railroad safety concern is

---

[5] In fact, the trial court itself observed: "[E]vidence was presented that some trains running through this area are 7,000 feet long, which means that any red light at the Stege Intersection would cause the train to block at least one grade crossing. Since clearance from the Union Pacific Dispatch never guarantees a green light at the Stege Intersection, any time a 7,000-foot train is sent from the Richmond Yard to the Stege Intersection, there is a possibility of at least a temporary grade crossing blockage. It would seem that there is nothing that BNSF can do about that, other than only to run 5,000-foot or shorter trains, a matter that would appear to implicate federal requirements concerning train length."

further evidenced by the absence of anything in the PUC record before the trial court that articulates the basis for such a conclusion. Rather, the focus of the PUC discussion in the interim opinion is on the community concerns created by blocked grade crossings. We agree with the trial court that general order No. 135 is aimed, not at railroad safety, but at reducing traffic congestion and ensuring that ambulances and other emergency vehicles are not blocked by stopped trains. (See *Lua v. Southern Pacific Transportation Co.* (1992) 6 Cal.App.4th 1897, 1899, 1902 [9 Cal.Rptr.2d 116] [pedestrian's injury, incurred when he climbed on a stopped train at a blocked crossing, did not result from an occurrence general order No. 135 was designed to prevent].) The trial court stated: "[R]oad blockages do not create a hazard to the railroad system or its participants—they pose a hazard only in the local communities in which the blockages occur, by blocking emergency vehicles and causing traffic jams that can lead to accidents in the community." These are local public safety issues, not issues of railroad safety.

The People and our concurring colleague suggest that any distinction between railroad safety and public safety is meaningless—and that the preemption analysis of any regulation affecting either should be conducted under the FRSA. They rely on *IC&E Railroad, supra*, 384 F.3d 557. In that case, the Iowa, Chicago & Eastern railroad challenged a state law that required it to finance the replacement of four bridges. Two of the bridges carried rail tracks over public highways and were described as "too narrow" and having " 'severely deficient vertical clearances for highway traffic.' " (*Id.* at p. 558.) The other two bridges carried public highways over the rail line. One had been destroyed by fire and the other had a sharp crest, which created a risk that vehicles using it would " 'bottom out.' " (*Ibid.*) The railroad argued that the ICCTA preempted the state statute, as applied, because it was economic regulation or regulation of facilities. (384 F.3d at p. 559.) The Eighth Circuit rejected the railroad's argument, reasoning as follows: "The argument is simple, but it is deceptively simple, for it ignores relevant federal statutes that were enacted before the ICCTA . . . and that Congress left intact in enacting ICCTA. [¶] . . . [¶] . . . The FRSA specifically addresses 'the railroad grade crossing problem.' 49 U.S.C. § 20134(a).[6] It also includes a

---

[6] Title 49 United States Code section 20134 provides, in relevant part: "(a) General.—To the extent practicable, the Secretary of Transportation shall maintain a coordinated effort to develop and carry out solutions to the railroad grade crossing problem and measures to protect pedestrians in densely populated areas along railroad rights of way. To carry out this subsection, the Secretary may use the authority of the Secretary under this chapter and over highway, traffic, and motor vehicle safety and over highway construction. The Secretary may purchase items of nominal value and distribute them to the public without charge as part of an educational or awareness program to accomplish the purposes of this section and of any other sections of this title related to improving the safety of highway-rail crossings and to preventing trespass on railroad rights of way, and the Secretary shall prescribe guidelines for the administration of this authority. [¶] (b) Signal systems and other devices.—Not later than June

limited preemption provision. . . . [¶] . . . [¶] . . . IC&E argued that the limited FRSA preemption provision does not apply because the County seeks to replace the bridges for reasons of 'highway improvement,' not rail safety. This argument is unpersuasive. The reasons for replacing the bridges as stated . . . clearly include a safety component. For example, the risk that school buses and emergency vehicles will bottom out on a highway bridge is a safety issue, albeit a highway safety issue. If IC&E is arguing that 'rail safety' for purposes of FRSA preemption does not include the highway safety risks created at rail crossings, that cramped reading of the FRSA is inconsistent with 49 U.S.C. § 20134(a), with the federal rail crossing regulations discussed in *Easterwood*, and with common sense. More importantly, the argument ignores other federal statutes that specifically address the problem of deteriorating or inadequate railway-highway bridges. [¶] . . . [¶] . . . ICCTA did not address these problems. Its silence cannot reflect the requisite 'clear and manifest purpose of Congress' to preempt traditional state regulation of public roads and bridges that Congress has encouraged in numerous other statutes. [Citation.]" (*IC&E Railroad, supra*, 384 F.3d at pp. 559–561, fn. omitted.)

*IC&E Railroad* is distinguishable. Unlike the situation we confront, *IC&E Railroad* did not involve an attempt to regulate how trains operate on railroad tracks. *IC&E Railroad* was concerned with railroad financing of bridges at the literal intersection of highway and railroad safety. Here, despite the PUC's indication that a finding had been made "that the regulation of blocking affects the safety of operations of railroads," the People make no effort to demonstrate the link. Instead, the People assert only that blocked rail crossings will delay emergency vehicles. This is a legitimate safety concern for those members of the public who cannot be reached by emergency vehicles located on the opposite side of blocked rail crossings, but it is not a "rail safety" concern. Furthermore, the *IC&E Railroad* court relied on the history of federal-state cooperation in the realm of highway safety, and concluded that preemption in its case would depend upon an implied repeal of the nonpreemption provision of the Federal-Aid Highway Act of 1944 (23 U.S.C. former § 144(p)) and its implementing regulations. (*IC&E Railroad, supra*, 384 F.3d at pp. 559–561.) There is no similar conflict in this case.

---

22, 1989, the Secretary shall prescribe regulations and issue orders to ensure the safe maintenance, inspection, and testing of signal systems and devices at railroad highway grade crossings. [¶] (c) Demonstration projects.—(1) The Secretary shall establish demonstration projects to evaluate whether accidents and incidents involving trains would be reduced by—[¶] (A) reflective markers installed on the road surface or on a signal post at railroad grade crossings; [¶] (B) stop signs or yield signs installed at grade crossings; and [¶] (C) speed bumps or rumble strips installed on the road surfaces at the approaches to grade crossings." (Some capitalization omitted.)

Looking at general order No. 135's terms, the effects of compliance, and its stated purpose, we conclude that general order No. 135 primarily relates to railroad transportation and that we must therefore analyze preemption under the ICCTA.

## C. *ICCTA Preemption*

■ Having concluded that the ICCTA governs the preemption analysis in this case, we must then decide whether general order No. 135 is preempted under that statute. The ICCTA "preempts all 'state laws that may reasonably be said to have the effect of managing or governing rail transportation, while permitting the continued application of laws [of general application] having a more remote or incidental effect on rail transportation.'" (*New York Susquehanna v. Jackson* (3d Cir. 2007) 500 F.3d 238, 252, quoting *Florida East Coast Railway v. City of West Palm Beach* (11th Cir. 2001) 266 F.3d 1324, 1331; accord, *Franks Investment Co. LLC v. Union Pacific Railroad Co.* (5th Cir. 2010) 593 F.3d 404, 410 (*Franks*); *Adrian & Blissfield Railroad Co. v. Village of Blissfield* (6th Cir. 2008) 550 F.3d 533, 539; *PCS Phosphate Co., Inc. v. Norfolk Southern Corp.* (4th Cir. 2009) 559 F.3d 212, 218.) ■ "[S]tate actions are 'categorically' or 'facially' preempted [by the ICCTA] where they 'would directly conflict with exclusive federal regulation of railroads.' [Citation.] Courts and the STB have recognized 'two broad categories of state and local actions' that are categorically preempted regardless of the context of the action: (1) 'any form of state or local permitting or preclearance that, by its nature, could be used to deny a railroad the ability to conduct some part of its operations or to proceed with activities that the [STB] has authorized' and (2) '*state or local regulation of matters directly regulated by the [STB]*—such as the construction, *operation*, and abandonment of rail lines; railroad mergers, line acquisitions, and other forms of consolidation; and railroad rates and service.' [Citations.] . . . Second, those state actions that do not fall into one of these categories may be preempted as applied: 'For state or local actions that are not facially preempted, the [ICCTA] preemption analysis requires a factual assessment of whether that action would have the effect of preventing or unreasonably interfering with railroad transportation.' [Citation.]" (*Adrian & Blissfield Railroad Co. v. Village of Blissfield, supra*, 550 F.3d at p. 540, italics added & omitted; accord, *Franks, supra*, 593 F.3d at pp. 410–411.) "The relevant question under the ICCTA is whether [the] dispute invokes laws that have the effect of managing or governing, and not merely incidentally affecting, rail transportation." (*Franks, supra*, 593 F.3d at p. 411.)

Contrary to the People's implicit suggestion, general order No. 135 is not a law of general application with only incidental impact on rail transportation. (See, e.g., *New York Susquehanna v. Jackson, supra*, 500 F.3d at p. 252 [some

but not all generally applicable environmental regulations preempted by ICCTA]; *Florida East Coast Railway v. City of West Palm Beach, supra*, 266 F.3d 1324 [generally applicable zoning ordinances are not sufficiently linked to rules governing the operation of the railroad so as to constitute regulation of rail transportation].) As previously noted, general order No. 135 is titled: "Regulations Governing the Occupancy of Public Grade Crossings by Railroads" (some capitalization omitted) and goes on to provide: "IT IS ORDERED . . . that each railroad corporation *operating* in the [S]tate of California shall observe the following regulations *in conducting operations* on and across public grade crossings: [¶] 1. *TRAIN MOVEMENTS*—Except as provided in Paragraph 5, a public grade crossing which is blocked by a stopped train . . . *must be opened within 10 minutes . . . .*" (Italics added.) Thus, it is clear that general order No. 135 directly regulates railroad operations. (*Franks, supra*, 593 F.3d at p. 411 ["[i]t is clear that . . . attempts to mandate when trains can use tracks and stop on them is attempting to manage or govern rail transportation in a direct way . . . ."].) Because general order No. 135 directly regulates railroad operations, it is preempted by the ICCTA.

The People have not cited, and we have not discovered through our independent research, a single case in which a court considered ICCTA preemption and concluded that an antiblocking regulation was not preempted.[7] In fact, after *Tyrrell* was decided, several courts have reached the opposite conclusion. (See *Elam v. Kansas City Southern Railway Co.* (5th Cir. 2011) 635 F.3d 796 (*Elam*); *Friberg, supra*, 267 F.3d 439; *Maynard v. CSX Transportation, Inc.* (E.D.Ky. 2004) 360 F.Supp.2d 836 (*Maynard*); *BNSF v. DOT* (2009) 227 Or.App. 468 [206 P.3d 261]; *City of Seattle, supra*, 41 P.3d at pp. 1171–1172.)

---

[7] A number of lower federal courts and some state courts have analyzed preemption of antiblocking regulation under the FRSA. (See *CSX Transportation v. City of Plymouth* (6th Cir. 2002) 283 F.3d 812; *CSX Transportation v. City of Plymouth, Michigan* (6th Cir. 1996) 86 F.3d 626; *CSX Transportation, Inc. v. City of Mitchell, Indiana* (S.D.Ind. 1999) 105 F.Supp.2d 949; *Rotter v. Union Pacific Railroad Co.* (E.D.Mo. 1998) 4 F.Supp.2d 872; *Village of Mundelein v. Wisconsin Central Railroad* (2008) 227 Ill.2d 281 [317 Ill.Dec. 664, 882 N.E.2d 544]; *Eagle Marine Industries, Inc. v. Union Pacific Railroad Co.* (2008) 227 Ill.2d 377 [317 Ill.Dec. 642, 882 N.E.2d 522]; *Krentz v. Consolidated Rail Corp.* (2006) 589 Pa 576 [910 A.2d 20]; *City of Seattle v. Burlington Northern Railroad Co.* (2002) 145 Wn.2d 661 [41 P.3d 1169] (*City of Seattle*); *State v. Wheeling & Lake Erie Railroad Co.* (2000) 139 Ohio App.3d 271 [743 N.E.2d 513].) This authority does not generally assist the People because in all but one of these cases the courts determined that such ordinances or statutes *were* preempted by the FRSA. (See *State v. Wheeling & Lake Erie Railroad Co., supra*, 139 Ohio App.3d 271 [antiblocking regulation not preempted by FRSA].) The *City of Seattle* court held that local antiblocking ordinances were preempted under both the ICCTA and the FRSA. (*City of Seattle*, 41 P.3d at p. 1170.) However, the other courts did not address the application of the ICCTA. Thus, we do not read this authority as support for the approach taken by our concurring colleague. Nor do any of these cases hold that an antiblocking statute that would be preempted under the ICCTA is saved by the exclusive application of the narrower FRSA preemption provision.

In *Elam, supra*, 635 F.3d 796, which was decided after the trial court issued its verdict in this case, the plaintiff sued a railway company after suffering injuries when she drove into the side of a stopped train. She alleged a cause of action for negligence per se based on the railway's violation of a Mississippi antiblocking statute, which limited the amount of time a stopped train could occupy a crossing. (*Id.* at pp. 801–802, 804.) The Fifth Circuit concluded that the ICCTA completely preempted the plaintiff's negligence per se claim because "Mississippi's antiblocking statute directly attempts to manage [the defendant's] switching operations, including . . . decisions as to train speed, length, and scheduling." (635 F.3d at pp. 803, 807.) The court relied on its previous decision, in *Friberg, supra*, 267 F.3d 439, in which it held that "the ICCTA does not permit states to directly regulate 'a railroad's economic decisions such as those pertaining to train length, speed or scheduling.' (*Id.* at[ p. ]444.)"[8] (*Elam, supra*, at p. 806.)

The *Elam* court emphasized that the antiblocking statute was not a generally applicable state law that had only "incidental" economic effects on railroads. The court observed: "Unlike generally applicable state property laws and rules of civil procedure that on their face 'have nothing to do with railroad crossings,' [citation], Mississippi's antiblocking statute [hones] in on 'railroad compan[ies]' and rail 'cross[ings.]' [Citation.]" (*Elam, supra*, 635 F.3d at p. 807.) The court also rejected the plaintiff's claim, based in part on *Tyrrell*, that her negligence claim involved "safety issues" and was, accordingly, saved by the narrower FRSA preemption provision. The court reasoned: "Regardless of why the Elams brought their negligence per se claim, the effect of the claim is to economically regulate [the defendant's] switching operations. . . . [A] state antiblocking statute like the one at issue in this case does not pertain to 'traditionally state-controlled safety issues.' [Citation.]" (635 F.3d at pp. 807–808.)

In *Maynard, supra*, 360 F.Supp.2d 836, property owners sued a railroad for nuisance after trains stopped on a railway side track blocked access to their homes. The railroad defended on the ground that plaintiffs' common law

---

[8] The *Friberg* court also said: "[T]he plain language of [49 United States Code section 10501], is so certain and unambiguous as to preclude any need to look beyond that language for congressional intent. We cannot accept the trial court's reasoning that the Texas Anti-Blocking Statute is a criminal provision that does not reach into the area of economic regulation of railroads. Regulating the time a train can occupy a rail crossing impacts, in such areas as train speed, length and scheduling, the way a railroad operates its trains, with concomitant economic ramifications that are not obviated or lessened merely because the provision carries a criminal penalty." (*Friberg, supra*, 267 F.3d at p. 443, fn. omitted.) The court also observed: "It is important to note that we are not faced with, and do not herein decide, what impact the ICCTA would have upon a state provision pertaining *strictly* to such traditionally state-controlled safety issues as local law enforcement and emergency vehicle access. That issue remains for another day and may have a substantially different result." (*Id.* at p. 444, fn. 18, italics added.)

nuisance claims were preempted by the ICCTA. (360 F.Supp.2d at pp. 837–838.) The district court agreed, reasoning as follows: "The side tracks allow the mainline track to be open for other rail travel, which enhances the movement of commerce on the rail lines. Because of their essential role, side tracks are a vital part of CSX's railroad operations. Because it is CSX's construction and operation of the side tracks in this case which give rise to Plaintiffs' claims, those claims are expressly preempted by the ICCTA." (*Id.* at p. 842.) The district court also rejected the plaintiffs' argument that the FRSA's narrow preemption provision saved their suit. The court observed: "[T]he common law remedies implicated in this case are not 'related to railroad safety' for purposes [of] section 20106. . . . Given the plain language of the ICCTA, even if the Plaintiffs were able to satisfy the savings provisions of the FRSA, the express preemption set forth in 49 U.S.C. § 10501(b)(2) would still be controlling." (360 F.Supp.2d at p. 843.)

We are not bound by *Elam, Friberg,* or *Maynard.* (See *People v. Wallace* (1992) 9 Cal.App.4th 1515, 1519, fn. 3 [12 Cal.Rptr.2d 230] [" 'decisions of the lower federal courts on federal questions are merely persuasive' "].) However, we find their reasoning highly persuasive and see no reasoned basis on which to distinguish their holdings. The State of California, by regulating the time a stopped train can occupy a public rail crossing, has necessarily and directly attempted to manage railroad operations. Accordingly, we conclude that general order No. 135 is preempted by the ICCTA.

## IV. DISPOSITION

The judgment is reversed.

Jones, P. J., concurred.

**NEEDHAM, J.,** Concurring.—Like the majority, I conclude that California's Public Utilities Commission (PUC) general order No. 135 (Order 135) is preempted by federal law. I reach that conclusion, however, by a different route: while the majority rules that the Federal Railroad Safety Act of 1970 (FRSA; 49 U.S.C. § 20101 et seq.) does not apply and the order is preempted under the Interstate Commerce Commission Termination Act (ICCTA; 49 U.S.C. § 10101 et seq.), I believe the FRSA does apply and the order does not fall within the FRSA's savings clause.

### A. *The FRSA Applies*

The test to determine whether preemption analysis should proceed under the FRSA is summarized in *Island Park, LLC v. CSX Transportation* (2d Cir. 2009) 559 F.3d 96 (*Island Park*). In *Island Park,* the court stated: "[the]

FRSA provides the appropriate basis for analyzing whether a state law, regulation or order *affecting rail safety* is preempted by federal law." (*Island Park*, at p. 107, italics added, citing *Tyrrell v. Norfolk Southern Railway Co.* (6th Cir. 2001) 248 F.3d 517, 523 (*Tyrrell*).) In other words, if the order affects rail safety, it must be analyzed for preemption purposes under the FRSA.

The majority opinion also relies on this quotation from *Island Park*, but inserts the word "primarily" in brackets before the word "affecting," apparently signifying the majority's view that the test requires a showing that the order is "primarily affecting" rail safety rather than merely "affecting" rail safety. (Maj. opn., *ante*, at p. 1524.) However, *Island Park* did not use the words "primarily affecting," but just the word "affecting." The FRSA does not refer to laws "primarily affecting" rail safety, but laws that are merely "related" to rail safety. (49 U.S.C. § 20106.) As the court explained in the underlying *Tyrrell* case, even if a state regulation has an alternative purpose and does not even reference rail safety, the regulation may still be "related" to railroad safety for purposes of the FRSA if it just has some connection with railroad safety. (*Tyrrell, supra*, 248 F.3d at p. 523.) The court in *Tyrrell* concluded: a state regulation may be related to railroad safety based on the potential safety aspects that arise from complying with the regulation. (*Ibid.*) In short, while there may have to be something more than a marginal or tangential affect on safety, I believe the test does not require that the order "primarily" affect rail safety.

The question, therefore, is whether compliance with Order 135 (e.g., such that trains do not block a railroad crossing for more than 10 minutes) has a connection to "rail safety." In my view, it does.

The FRSA itself suggests that this question should be answered in the affirmative. After all, the FRSA already regulates railroad crossings and grades, largely in regard to crossing signals and attendant dangers in traversing the tracks. (49 U.S.C. § 20134(a); see 23 C.F.R. § 646.214(b) (2012).)[1] Since the rail safety provisions of the FRSA address railroad crossings, it takes no great stretch of the imagination to conclude that an order addressing the *blocking* of railroad crossings might also have implications for rail safety. (See *Island Park, supra*, 559 F.3d at pp. 104, 108 [FRSA, not ICCTA,

---

[1] Among other things, 49 United States Code section 20134 directs the Secretary of Transportation to prescribe regulations and issue orders in connection with signal systems at railroad highway grade crossings and to evaluate whether accidents and incidents involving trains would be reduced by reflective markers or signs at crossings or by speed bumps on road surfaces approaching the crossings. "The FRSA specifically addresses 'the railroad grade crossing problem.' 49 U.S.C. § 20134(a)." (*Iowa, Chicago & Eastern Railroad Corp. v. Washington County, Iowa* (8th Cir. 2004) 384 F.3d 557, 559 (*IC&E Railroad*).)

applied to state order closing roadway that crossed railroad tracks, noting the risk of collision between trains and vehicles].)

This conclusion is buttressed by the language of Order 135, which expresses great concern for safety both from the standpoint of the public and from the standpoint of the railroad. Order 135 prohibits trains from blocking public grade crossings for more than 10 minutes "unless no vehicle or pedestrian is waiting at the crossing," indicating an intent to avoid the local safety problems arising from blocked crossings, such as the hindrance of emergency fire vehicles, ambulances, and law enforcement vehicles, the dangers arising from vehicles or pedestrians attempting to get around or over the stopped trains, and the risks inherent in the traffic congestion posed by blocked intersections in the area of the crossing. On the other hand, Order 135 is sensitive to the safety concerns of the railroad, providing an exception if the blocking results from "conditions rendering the roadbed or track structure *unsafe*" (italics added), compliance with law (like air brake safety checks), or other occurrences over which the railroad has no control. Similarly, Order 135 provides in paragraph 7 that a "crew member of a train blocking a public crossing shall immediately take all reasonable steps . . . to clear the crossing upon receiving information from a peace officer, member of any fire department . . . or operator of an emergency vehicle . . . that emergency circumstances require the clearing of the crossing," but provides that such steps need only be "consistent with the *safe operation of such train.*" (Italics added.) In short, on its face Order 135 recognizes and attempts to balance the public safety concerns arising from a blocked railroad crossing and the railroad's concerns arising from not blocking it.

In my view, therefore, Order 135 has implications for railroad safety in two respects: (1) the *safety of the public* arising from a blocked railroad crossing and (2) the *safety of the railroad* in complying with the order.

### 1. *Public Safety Concerns Arising from Blocked Rail Crossings*

The PUC, the trial court, respondent, and the majority opinion all agree—as do I—that the primary intent behind Order 135 is to protect the public from the dangers of blocked railroad crossings. I have already discussed how the language of Order 135 bears out this conclusion; the history of the order supports it as well. For example, in considering whether to promulgate Order 135, the PUC cited "chaotic traffic conditions" and the isolation of communities caused by blocked crossings—both local safety issues. As the majority puts it, Order 135 is aimed at "reducing traffic congestion and ensuring that ambulances and other emergency vehicles are not blocked by stopped trains." (Maj. opn., *ante*, at p. 1526.) In purpose and effect, Order 135 affects public safety in connection with railroad crossings.

The majority concludes, however, that Order 135 only "tangentially" relates to railroad safety, and thus the FRSA does not apply. (Maj. opn., *ante*, at p. 1524.) The majority points out that the order affects railroad operations, and then it draws a distinction between railroad safety and public safety. I respectfully find neither point persuasive and conclude that the order affects railroad safety to a sufficient degree.[2]

It is true that Order 135 affects railroad operations, but railroad operations will always be affected by any order that tells the railroad what to do with its trains, even if the order affects railroad safety within the meaning of the FRSA. At issue at this juncture is whether the order *not only* affects railroad operations, but *also* affects railroad safety. The FRSA itself acknowledges this by stating it was enacted "to promote safety in every area of railroad *operations* and reduce railroad-related accidents and incidents." (49 U.S.C. § 20101, italics added.)

As to the majority's distinction between railroad safety and public safety, I must also disagree. In the first place, a PUC hearing officer during the promulgation of Order 135 affirmatively found that "the regulation of blocking affects the safety of operations of railroads." The majority dismisses this statement as unsupported by the record, but the PUC report in the record tells us that no party in the PUC proceedings took exception to the finding and that the finding was indeed "supported by the record" in those proceedings. At any rate, the hearing officer's inference was well taken: a railroad cannot be said to operate safely if it is causing traffic congestion and preventing emergency vehicles from saving lives and property in the community.

Even without considering the hearing officer's statement, I cannot accept the majority's distinction between railroad safety and public safety. There are, of course, some aspects of railroad safety that are not matters of public safety: *Tyrrell*, when speaking about railroad safety, referred to the safety of railway employees; *Island Park*, when discussing railway safety, did so in the context of an order reducing the risk of a vehicle colliding with a train; and the FRSA provision pertaining to railway crossings seems most concerned with a train colliding with a vehicle or person or causing other damage. Order 135, by contrast, deals with the risk that a train will block an emergency vehicle, not collide with it: the act of blocking ostensibly raises no safety implications for the train or railroad itself, just for the people needing to cross the tracks or requiring assistance on the other side of the crossing. But neither

---

[2] The majority mischaracterizes my concurrence as stating that the FRSA governs if an order merely has a tangential connection to rail safety. I have said no such thing. The obvious point of my concurrence is not that an order relating merely tangentially to railroad safety must be analyzed under the FRSA, but that Order 135 has a connection to railroad safety that is not merely tangential.

the FRSA nor any cases brought to our attention state that, under a regulation akin to Order 135 that specifically targets railroads, public safety concerns arising out of railroad operations cannot be part of the broader concept of railroad safety for purposes of the FRSA. In my view, the safety of the public from the railroad's use of a crossing, and the safety of the railroad from the railroad's use of a crossing, poses a distinction without a difference.

Of some assistance in this regard is *IC&E Railroad, supra,* 384 F.3d at page 561. There, a state law required the financing of two bridges carrying rail tracks over public highways and two bridges carrying public highways over rail tracks. The court rejected Iowa, Chicago & Eastern Railroad's argument that the FRSA did not apply because the bridges were to be replaced for purposes of highway safety rather than railroad safety. The court explained: "If IC&E is arguing that 'rail safety' for purposes of FRSA preemption does not include the highway safety risks created at rail crossings, that cramped reading of the FRSA is inconsistent with 49 U.S.C. § 20134(a) [(addressing railroad grade crossings)], with the federal rail crossing regulations discussed in *Easterwood* [*CSX Transp., Inc. v. Easterwood* (1993) 507 U.S. 658, 665–671 [123 L.Ed.2d 387, 113 S.Ct. 1732], and with common sense." (*IC&E Railroad,* at p. 560, italics added.)

As the majority opinion notes, the circumstances in *IC&E Railroad* were a bit different than the situation here, since the safety concern in *IC&E Railroad* was to emergency vehicles at the crossing area rather than the blocking of emergency vehicles at the crossing area. Both there and here, however, the salient point is that the FRSA relates to safety matters arising out of the operations of railroads, even if those matters might be characterized as public safety concerns. Indeed, the FRSA broadly states that it was enacted "to promote safety in *every* area of railroad operations and reduce railroad-related accidents and incidents." (49 U.S.C. § 20101, italics added.) Order 135, limiting the time a train may block a crossing, affects "safety in [an] area of railroad operations" and "railroad-related . . . incidents."

Because Order 135 is crafted to guard the safety of the public from specific risks created only by railroads blocking public crossings, it is connected to railroad safety and thus subject to preemption analysis under the FRSA.

### 2. *Railroad Safety Implications in Complying with Order 135*

Whether or not the public safety concerns of Order 135 bring it within the scope of the FRSA, the implications of Order 135 for the safety of railroads certainly do.

In *CSX Transportation v. City of Plymouth* (6th Cir. 1996) 86 F.3d 626 (*Plymouth I*), a Plymouth ordinance prohibited trains from obstructing free

passage of any street for longer than five minutes. (*Id.* at p. 627.) Plymouth urged that the ordinance was not preempted under the FRSA because it was intended to promote the general welfare and was not directed to railway safety. (*Plymouth I*, at p. 629.) The court rejected the argument. Neither the intended purpose of the ordinance, nor the lack of any reference to railroad safety in the ordinance, precluded a finding that the ordinance was "related to" railroad safety, because compliance with the order would require the railroad to run shorter trains, forcing the railroad to compensate by running more trains or trains at higher speeds, which in turn would impact the number of accidents and, therefore, railroad safety. (*Id.* at pp. 629–630.) Accordingly, Plymouth's antiblocking ordinance was subject to the FRSA. (*Plymouth I*, at p. 630.)

In the matter before us, there is no dispute that compliance with Order 135 would require railroads to run shorter trains; in fact, the trial court noted: "[E]vidence was presented that some trains running through this area are 7,000 feet long, which means that any red light at the Stege Intersection would cause the train to block at least one grade crossing. Since clearance from the Union Pacific Dispatch never guarantees a green light at the Stege Intersection, any time a 7,000-foot train is sent from the Richmond Yard to the Stege Intersection, there is a possibility of at least a temporary grade crossing blockage. *It would seem that there is nothing that BNSF can do about that, other than only to run 5,000-foot or shorter trains, a matter that would appear to implicate federal requirements concerning train length.*" (Italics added.) From this, it must be assumed—as a matter of law or at least mathematics—that the railroad would have to run trains faster or more frequently to make up the difference. (*Plymouth I, supra*, 86 F.3d at p. 630; *CSX Transportation v. City of Plymouth* (E.D.Mich. 2000) 92 F.Supp.2d 643, 655 & fn. 6 (*Plymouth II*).) A reasonable inference from these facts is that the order bears a connection to railroad safety.[3] (See *Plymouth I, supra*, 86 F.3d at pp. 629–630.) Accordingly, Order 135 must be analyzed under the FRSA.

Lastly, I find it appropriate to analyze Order 135 under the FRSA for yet another reason. If the ICCTA applied, and the FRSA did not, the antiblocking order would be preempted and there could be no federal or state law, let alone local ordinance, to deal with the obvious local problems caused when trains block crossings. (49 U.S.C. § 10501(b).) Public citizens, cities, and states

---

[3] The trial court in this case stated that "road blockages do not create a hazard to the railroad system or its participants . . . ," but that was in the context of deciding whether Order 135 regulated a local safety hazard only, not whether the FRSA should apply. At any rate, the court's inference seems inconsistent with its findings that blockages may be caused by train length and that the order affects train length and thus implicates federal regulations. In addition, unlike the court in *Plymouth I*, the trial court here did not cite evidence establishing that increased train speeds would affect railroad safety, but that is the logical inference from the evidence and, indeed, no evidence in the record shows otherwise.

would have no remedy for this harm to local communities. If, on the other hand, the FRSA applies, an antiblocking order has at least a chance of surviving due to the FRSA's savings clause for certain state regulations of "local safety . . . hazard[s]." (49 U.S.C. § 20106(a).) Because the regulation of local safety hazards is traditionally a matter for the states (e.g., *Medtronic, Inc. v. Lohr* (1996) 518 U.S. 470, 485 [135 L.Ed.2d 700, 116 S.Ct. 2240]), and because the ICCTA and FRSA are to be construed together in pari materia (*Tyrrell, supra,* 248 F.3d at p. 523), it seems to me that any doubts as to the FRSA's applicability should be resolved in favor of analyzing the order under the FRSA.

In sum, the terms and purpose of Order 135, as well as the consequences of compliance, all plainly pertain to local safety issues arising out of a train's blocking a railway crossing or safety issues arising out of the railroad's efforts not to block it. Order 135 therefore affects and is related to railroad safety, and Order 135 must be analyzed under the FRSA.

### B. *Preemption Under the FRSA*

The next task is to determine whether the FRSA actually preempts Order 135. To do so, two subissues must be addressed: (1) does the FRSA regulate or cover the subject matter of Order 135, and (2) is Order 135 nonetheless saved from preemption in that it falls within an exception for state laws that are necessary to reduce an essentially local safety hazard.

#### 1. *The FRSA "Covers" the Subject of Time Limits on Stopping at Crossings*

The FRSA provides: "A State may adopt or continue in force a law, regulation, or order related to railroad safety or security until the Secretary of Transportation (with respect to railroad safety matters) . . . prescribes a regulation or issues an order *covering* the subject matter of the State requirement." (49 U.S.C. § 20106(a), italics added.) To "cover[]" subject matter in this context, federal regulations must not merely "touch upon" or "relate to" the subject matter, but "substantially subsume" it. (*CSX Transp., Inc. v. Easterwood, supra,* 507 U.S. at p. 664 (*Easterwood*).)

Here, the trial court concluded that the subject matter of Order 135 was not covered by federal regulations because there is no specific regulation addressing the length of time a stopped train may block a public road grade crossing. The concept of "covering," however, does not require a federal regulation to match the subject matter of the state regulation exactly. It is enough if one or more federal regulations, independently or collectively, substantially subsume the subject matter so as to warrant the conclusion that Congress intended

preemption. (E.g., *Easterwood, supra,* 507 U.S. at pp. 674–675.) Thus, a "series of related regulations and overall structure of the regulations" may be sufficient to find the subject matter covered, even if "no regulation directly address[es] the state requirement." (*Burlington Northern and Santa Fe Railway Co. v. Doyle* (7th Cir. 1999) 186 F.3d 790, 796.)

Respondent identifies the subject matter of Order 135 as "the length of time a stopped train may block a public road grade crossing." Implicitly, however, the subject matter of Order 135 comprises what the railroad must do to comply with the order, which includes adjustments to train length and, as a result, train speed. (*Plymouth I, supra,* 86 F.3d at pp. 629–630; *Plymouth II, supra,* 92 F.Supp.2d at p. 657.) Indeed, the trial court in this case acknowledged that "a blockage may be caused in part by the length of a train" and "speed limits may create blockages." On this basis, appellate courts that have actually analyzed the question have concluded that the subject matter of antiblocking statutes is covered by federal regulations promulgated under the FRSA. (E.g., *Plymouth II, supra,* 92 F.Supp.2d at p. 657; *Eagle Marine Industries, Inc. v. Union Pacific Railroad Co.* (2008) 227 Ill.2d 377 [317 Ill.Dec. 642, 882 N.E.2d 522, 524].) Neither the briefing in this case nor the record on appeal persuades me that these courts erred in this regard.[4] Additionally, as discussed *ante,* federal regulations address other aspects of safety at railroad crossings. (23 C.F.R. § 646.214(b) (2012).) At least for purposes of this appeal, therefore, I would conclude that the Secretary of Transportation has prescribed regulations that, taken as a whole, reflect Congressional intent to cover the subject matter of Order 135.

### 2. *The FRSA Savings Clause Does Not Apply*

Because (or assuming) the FRSA covers the subject matter of Order 135, the order is preempted unless it falls within the FRSA's savings clause.

---

[4] This is a close question, and one that the trial court did not approach lightly. Of some additional interest may be two documents judicially noticed by the court. One Federal Railroad Administration (FRA) document, entitled "Trains Blocking Highway-Rail Grade Crossings Fact Sheet," notes that the FRA "does not regulate the length of time a train may block a grade crossing" but adds that many blockages may be the result of compliance with federal requirements. The fact sheet further advises that many states have laws regulating blockages and "the issue of a state's authority to legislate or regulate blocked crossings is highly contentious and still being defined in the courts." It does not assert that state regulation is preempted. A second document purports to be a "model grade crossing law" drafted by the National Committee on Uniform Traffic Laws and Ordinances, which guides *states* in drafting such laws. Among other things, the model rule prohibits trains from blocking crossings for more than five minutes—and appears to present a law of statewide application. (National Committee Highway-Rail Grade Crossing Model Law, § 11-705 (1997) <http://www.ncutlo. org/railgrade05.html> [as of Oct. 16, 2012].) The parties in this case offered competing interpretations of these documents, and the trial court observed: "The record in this case does not provide enough information about the documents to allow the Court to fully explore the issue."

Under this clause, the FRSA allows a state to "adopt or continue in force an additional or more stringent law, regulation, or order related to railroad safety or security when the law, regulation or order . . . [¶] . . . is *necessary to eliminate or reduce an essentially local safety or security hazard*" and certain other conditions are met. (49 U.S.C. § 20106(a), italics added.)

Here, the primary question is whether Order 135 is necessary to eliminate or reduce an essentially local safety hazard. In concluding that the order pertained to an essentially local safety hazard, the trial court logically posited that each blocked crossing creates problems only for the local community in which it occurs.

The trial court's decision, however, was inconsistent with the legislative history of the FRSA and cases interpreting it. Under the FRSA, a state law is not saved from preemption if it regulates a safety concern *throughout* the state. The legislative history explains: " 'The purpose of [the savings clause] is to enable the states to respond to local situations not capable of being adequately encompassed within the uniform national standards. . . . Since *these local hazards would not be statewide in character*, there is no intent to permit a state to establish statewide standards superimposed on national standards covering the same subject matter.' " (*Duluth, Winnipeg, and Pacific Railway Co. v. City of Orr* (8th Cir. 2008) 529 F.3d 794, 798, italics added (*Duluth*), quoting H.R.Rep. No. 91-1194, at p. 11 (1970), reprinted at 1970 United States Congressional and Administrative News 4104, 4117.)

Thus, the term "local safety . . . hazard" in the savings clause refers to "local situations [that] are *not statewide in character* and not capable of being adequately encompassed within uniform national standards." (*National Association of Regulatory Utility Commissioners v. Coleman* (3d Cir. 1976) 542 F.2d 11, 14–15, italics added [statewide reporting requirements do not fall within FRSA savings clause, which was designed to enable state to respond to local situations]; see *Duluth, supra,* 529 F.3d at p. 798; *CSX Transportation, Inc. v. Williams* (D.C. Cir. 2005) 365 U.S. App.D.C. 331 [406 F.3d 667, 672] [per curiam]; *Norfolk & Western Railway Co. v. Public Utilities Com.* (6th Cir. 1991) 926 F.2d 567, 571.) And this is so even if the harm or damage arising from an incident would occur only locally. (*Union Pacific Railroad Co. v. California PUC* (9th Cir. 2003) 346 F.3d 851, 860–862 [PUC rule dictating operations at certain sites did not fall within FRSA exception for essentially local safety hazard, even though the sites had high derailment rates, steep grades and sharp curves, and the damage arising from derailment would affect the locality].)

Order 135 was promulgated to address a statewide concern about blocked railway crossings and applies to all railroads and crossings throughout the state. As such, Order 135 does not fall within the scope of the FRSA savings clause.

### C. Majority Opinion's Cases

In concluding that Order 135 is preempted by the ICCTA, the majority relies in substantial part on a trio of federal cases—one federal district case and two from the same federal circuit: *Maynard*, *Friberg*, and *Elam*. Those cases do not contradict my analysis.

In *Maynard v. CSX Transportation* (E.D.Ky. 2004) 360 F.Supp.2d 836 (*Maynard*), property owners sued a railroad for nuisance and denial of egress/ingress to their residence due to trains that stopped on a railway side track near their homes. The plaintiffs also complained of drainage problems that arose from the construction and maintenance of the tracks. The federal district court ruled that the nuisance claims were preempted by the ICCTA, because side tracks and their construction constituted a vital part of railroad operations. The court also ruled that the FRSA did not apply, because the common law remedies implicated in the case were not related to railroad safety.

*Maynard* is distinguishable from the case before us, because it did not concern an antiblocking statute and had nothing to do with any safety concerns.

In *Friberg v. Kansas City Southern Railway Co.* (5th Cir. 2001) 267 F.3d 439 (*Friberg*), a railroad started using a side track more frequently, such that the crossing was blocked by waiting trains more often and customers using the adjacent road encountered delays in getting to or from the plaintiffs' nursery. (*Id.* at p. 441.) The plaintiffs experienced a general decline in business and eventually closed the nursery. They filed suit against the railroad, alleging negligence and negligence per se based on a Texas anti-blocking statute, which prohibited trains from blocking a street, highway or railroad crossing for more than five minutes. (*Id.* at p. 441 & fn. 2.) The Fifth Circuit held that regulating the time that a train can occupy a railroad crossing impacts train speed, length, scheduling, and operations. (*Id.* at p. 443.) On that basis, the court ruled that the antiblocking statute, as well as the plaintiffs' common law claim of negligence, were preempted by the ICCTA. (*Friberg*, at p. 444.)

*Friberg* is distinguishable from this case, because it did not address an antiblocking statute in the context of public safety, but in the context of

interference with private citizens' business concerns. Indeed, the court in *Friberg* stated in a footnote that it was not deciding whether the plaintiffs' claims were preempted by the FRSA, adding that it was "important to note that we are not faced with, and do not herein decide, what impact the ICCTA would have upon a state provision pertaining strictly to such traditionally state-controlled safety issues as local law enforcement and emergency vehicle access. That issue remains for another day and may have a substantially different result." (*Friberg, supra,* 267 F.3d at p. 444, fn. 18.)

*Elam v. Kansas City Southern Railway Co.* (5th Cir. 2011) 635 F.3d 796 (*Elam*) followed *Friberg.* The plaintiff had sued a railroad after suffering injuries when she drove her vehicle into the side of a stopped train. (*Id.* at p. 801.) She alleged a cause of action for negligence per se based on a Mississippi antiblocking statute that limited the amount of time a stopped train could occupy a highway crossing (five minutes) or street crossing (as prescribed by local ordinance). (*Id.* at pp. 801, 804, fn. 2.) The Fifth Circuit ruled that the plaintiff's negligence per se claim, based on the antiblocking law, was preempted. Following *Friberg,* the court held that the antiblocking statute directly managed railroad operations (including train speed, length, and scheduling), fell within the realm of railroad economics, did not pertain to traditionally state-controlled safety issues, and was thus preempted by the ICCTA and not saved by the FRSA. (*Elam,* at pp. 807–808.)

*Elam* is distinguishable from this case, because the antiblocking statute there was a blanket prohibition against blocking a crossing for a time period prescribed by a locality, while Order 135 permits a railroad to block the crossing if there is no vehicle or pedestrian waiting or if it is necessary due to some other law or railroad safety. In other words, Order 135 is more clearly directed to safety than the statute in *Elam.* Moreover, *Elam* is not persuasive with respect to the applicability of the FRSA in this case. Although *Elam* ruled that antiblocking statutes do not regulate traditionally state-controlled safety issues, it did so without any analysis except to say that the question was "already determined" in *Friberg,* citing the *Friberg* decision at footnote 18 (see discussion of the fn. above). (*Elam, supra,* 635 F.3d at p. 808.) *Friberg,* however, did *not* involve a public safety issue, and expressly warned that it was *not* deciding the applicability of the FRSA, so *Friberg* is plainly not authority for the proposition asserted in *Elam.* This leaves no support for *Elam*'s conclusion.

In the final analysis, Order 135 must be evaluated for preemption under the FRSA, the FRSA covers the subject matter of the order, and the FRSA savings clause does not apply. Because Order 135 is preempted under the FRSA, I concur that the judgment must be reversed.

I concur.